**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1980

ROXANA ORELLANA SANTOS,

          Plaintiff – Appellant,

     v.

FREDERICK COUNTY BOARD OF COMMISSIONERS; CHARLES JENKINS,
Frederick County Sheriff, in his official and individual
capacity; JEFFREY OPENSHAW, Frederick County Deputy Sheriff,
in his official and individual capacity; KEVIN LYNCH,
Frederick County Deputy Sheriff, in his official and
individual capacity,

          Defendants – Appellees,

     and

JULIE L. MEYERS, former Assistant Secretary for Homeland
Security of Immigration and Customs Enforcement, in her
official and individual capacity; CALVIN MCCORMICK, Field
Office Director of the ICE Office of Detention and Removal,
in his official and individual capacity; JAMES A. DINKINS,
Special Agent in Charge of the ICE Office of Investigations,
Baltimore, MD, in his official and individual capacity,

          Defendants.

--------------------------------

IMMIGRATION REFORM LAW INSTITUTE,

          Amicus Supporting Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Benson Everett Legg, Senior District
Judge.  (1:09-cv-02978-BEL)

Argued: May 15, 2013                     Decided: August 7, 2013

Before DAVIS and WYNN, Circuit Judges, and James R. SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Davis and Judge Spencer concurred.

**ARGUED:** John Carney Hayes, Jr., NIXON PEABODY, LLP, Washington, D.C., for Appellant. Sandra Diana Lee, KARPINSKI, COLARESI & KARP, P.A., Baltimore, Maryland, for Appellees. **ON BRIEF:** Daniel Karp, KARPINSKI, COLARESI & KARP, Baltimore, Maryland, for Appellees. Michael M. Hethmon, Garrett R. Roe, IMMIGRATION REFORM LAW INSTITUTE, Washington, D.C., for Amicus Supporting Appellees.

WYNN, Circuit Judge:

Plaintiff Roxana Orellana Santos appeals the dismissal of her 42 U.S.C. § 1983 action against the Frederick County (Maryland) Board of Commissioners, the Frederick County Sheriff, and two deputy sheriffs. Santos alleged that the deputies violated her Fourth Amendment rights when, after questioning her outside of her workplace, they arrested her on an outstanding civil warrant for removal issued by Immigration and Customs Enforcement ("ICE"). The U.S. District Court for the District of Maryland granted summary judgment to all defendants, concluding that Santos's initial questioning by the deputies did not implicate the Fourth Amendment and that the civil immigration warrant justified Santos's subsequent stop and arrest.

We agree with the district court that the deputies did not seize Santos until one of the two deputies gestured for her to remain seated while they verified that the immigration warrant was active. But the civil immigration warrant did not provide the deputies with a basis to arrest or even briefly detain Santos. Nonetheless, we conclude that the individual defendants are immune from suit because at the time of the encounter neither the Supreme Court nor this Court had clearly established that local and state law enforcement officers may not detain or arrest an individual based on a civil immigration warrant.

3

Qualified immunity does not extend, however, to municipal defendants. We therefore affirm the district court's award of summary judgment to the deputies and the Sheriff and vacate the district court's dismissal of Santos's action against the municipal defendants.

## I.

### A.

A native of El Salvador, Santos moved to the United States in 2006. On an October morning in 2008, Santos sat on a curb behind the Common Market food co-op in Frederick, Maryland, where she worked as a dishwasher. Santos ate a sandwich while waiting for her shift to begin. From the curb, Santos faced a grassy area and pond that ran along the rear of the shopping complex in which the co-op was located. A large metal shipping container stood between her and the shopping complex. As Santos ate, she saw a Frederick County Sheriff's Office (the "Sheriff's Office") patrol car slowly approach her from her left. She remained seated, in full view of the patrol car, and continued eating her sandwich.

Deputy Sheriffs Jeffrey Openshaw and Kevin Lynch were in the car conducting a routine patrol of the area. Although the Sheriff's Office had reached an agreement with ICE under 9 U.S.C. § 1357(g) authorizing certain deputies to assist ICE in

4

immigration enforcement efforts, neither Openshaw nor Lynch was trained or authorized to participate in immigration enforcement.

The deputies parked the patrol car on the side of the shipping container opposite Santos. Openshaw and Lynch stepped out of the patrol car and walked toward Santos, going around opposite sides of the shipping container to reach her. Both deputies wore standard uniforms and carried guns.

Openshaw stopped about six feet away from her and asked her if she spoke English, to which she responded, "No." J.A. 095, 398-99. Lynch stood closer to the patrol car. It was immediately apparent to Openshaw that Santos, a native Spanish speaker, had difficulty communicating in English. Openshaw asked Santos in English whether she was on break, and she replied that she was. He then asked her if she worked at the Common Market, and she said she did. Again in English, Openshaw asked her whether she had identification, and she responded in Spanish that she did not.

At this point, Openshaw stepped away from Santos to speak privately with Lynch near the patrol car. Santos remained seated. After a few minutes, Santos recalled that she had her El Salvadoran national identification card in her purse. Still sitting, she showed the card to the deputies. Openshaw took the card and asked her whether the name on the ID was hers. She told him it was, and he walked back to the car to speak with

5

Lynch. Santos estimated that by this time at least fifteen minutes had passed since the deputies first approached her. As the deputies stood together talking, Santos saw Openshaw use his radio.

The deputies said that once they received Santos's identification information, they relayed it to radio dispatch to run a warrant check on Santos. After completing the warrant check, dispatch informed the deputies that Santos had an outstanding ICE warrant for "immediate deportation." J.A. 188. Following standard procedure, Openshaw asked dispatch to verify that the ICE warrant was active. Although he did not know what dispatch did in this particular case, Openshaw testified that dispatch typically contacts ICE when verifying an immigration warrant. Openshaw also said that at this point he considered Santos to be under arrest, though he had not yet handcuffed her.

After dispatch had initially notified the deputies of the ICE warrant but before dispatch had determined whether the warrant was active, Santos asked the deputies if there was any problem. Openshaw replied, "No, no, no," and held out his hand, gesturing for her to remain seated. J.A. 136.

About twenty minutes after she handed the deputies her national ID card, Santos decided to head into the food co-op to start her shift. When she attempted to stand, the deputies, who just had been informed by dispatch that the warrant was active,

6

grabbed her by the shoulders and handcuffed her. Until this point, neither deputy had had any physical contact with her.

The deputies placed Santos in the patrol car, transported her to patrol headquarters, and then transferred her to a Maryland detention center. Approximately forty-five minutes after Santos's arrest, ICE Senior Special Agent S. Letares requested that the detention center hold Santos on ICE's behalf. ICE initially held Santos in two Maryland facilities and then transferred her to a jail in Cambridge, Massachusetts, where she stayed until her supervised release on November 13, 2008. Santos v. Frederick Cnty. Bd. of Comm'rs, 884 F. Supp. 2d 420, 425 (D. Md. 2012).

B.

In November 2009, Santos filed a Section 1983 complaint against Openshaw and Lynch, Frederick County Sheriff Charles Jenkins, the Frederick County Board of Commissioners, and several individuals from ICE and the Department of Homeland Security. The complaint alleged that the deputies violated her Fourth Amendment rights when they seized and later arrested her. The complaint also alleged that the deputies violated her rights under the Equal Protection Clause of the Fourteenth Amendment because the deputies "approached . . . and interrogated her

7

based solely on her perceived race, ethnicity and/or national origin." J.A. 102.

All defendants moved to dismiss Santos's initial complaint under Rule 12(b)(6). The district court dismissed without prejudice the Section 1983 claims against the deputies on grounds that the complaint alleged that the deputies were acting under the color of federal law and thus the action should have been brought under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).[1] Santos v. Frederick Cnty. Bd. of Comm'rs, No: L-09-2978, 2010 WL 3385463, at *3 (D. Md. Aug. 25, 2010). The district court also bifurcated her supervisory liability claims against Sheriff Jenkins and the Board of Commissioners, and stayed those claims pending resolution of Santos's claims against the deputies. Id. at *4.

Santos filed a second amended complaint against the same defendants, asserting essentially the same claims as in the previously dismissed complaint. And she did not recharacterize her claims against the municipal defendants as Bivens claims.

After discovery, the deputies moved for summary judgment. The district court granted the deputies' motion, concluding that there was no dispute of fact regarding whether the deputies

---

[1] Bivens established a private right of action to remedy constitutional injuries attributable to individuals acting under the color of federal law. 403 U.S. at 397.

8

violated Santos's Fourth Amendment rights.  Santos, 884 F. Supp. 2d at 428-29.  In particular, the district court held that Santos was not "seized" for purposes of the Fourth Amendment until Openshaw gestured for her to remain seated, and that, at that time, the civil ICE warrant provided the deputies with adequate justification for the seizure.  Id.  The district court further concluded that Santos's Equal Protection claim failed as a matter of law, holding that law enforcement officers do not violate the Equal Protection Clause if they initiate consensual encounters solely on the basis of racial considerations.[2]  Id. at 429-30.  Having concluded that the deputies did not violate Santos's constitutional rights, the district court also dismissed Santos's claims against Sheriff Jenkins and the Frederick County Board of Commissioners.  Id. at 432.

---

[2]  Santos did not appeal the district court's Equal Protection decision, and it is therefore not before us. Nevertheless, we note that while this Circuit has not yet addressed the issue, see United States v. Henderson, 85 F.3d 617, 1996 WL 251370, at *2 (4th Cir. 1996) (unpublished table decision) (declining to decide "whether selecting persons for consensual interviews based solely on race raises equal protection concerns"), two other Circuit Courts have indicated that consensual encounters initiated solely based on race may violate the Equal Protection Clause, United States v. Avery, 137 F.3d 343, 353 (6th Cir. 1997) ("[C]onsensual encounters may violate the Equal Protection Clause when initiated solely based on racial considerations."); United States v. Manuel, 992 F.2d 272, 275 (10th Cir. 1993) ("[S]electing persons for consensual interviews based solely on race is deserving of strict scrutiny and raises serious equal protection concerns.").

9

Santos moved for reconsideration under Federal Rule of Civil Procedure 59(e), highlighting a number of federal court decisions authored after the district court's summary judgment hearing holding that state and local governments lack inherent authority to enforce civil federal immigration law. The district court denied Santos's motion, holding that even if the other federal court decisions and the Supreme Court's landmark immigration decision in Arizona v. United States, 132 S. Ct. 2492, 2507 (2012), suggested an "emerging consensus" that local officers may not enforce civil immigration law, the deputies were still entitled to qualified immunity for their conduct. J.A. 624. Santos timely appealed.

## II.

The Fourth Amendment secures an individual's right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. In determining whether a law enforcement officer unconstitutionally seized an individual, we engage in a multi-step inquiry. Because "not every encounter between a police officer and a citizen is an intrusion requiring an objective justification," United States v. Mendenhall, 446 U.S. 544, 553 (1980) (opinion of Stewart, J.), we first must decide if and when the individual was "seized" for purposes of the Fourth Amendment, United States v. Wilson, 953 F.2d 116, 120 (4th Cir.

10

1991). If we conclude the individual was "seized," we then determine whether the law enforcement officer had adequate justification to support the seizure. Terry v. Ohio, 392 U.S. 1, 20-22 (1968). Finally, in Section 1983 cases, even if a seizure runs afoul of the Fourth Amendment, a plaintiff may not be able to obtain relief if the defendant is entitled to qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Santos raises objections to the district court's rulings on each of these three issues. In particular, Santos argues that the district court (1) improperly determined that she was not "seized" when the deputies initially approached and questioned her; (2) incorrectly held that the deputies did not violate her Fourth Amendment rights when they detained and later arrested her based on the civil ICE warrant; and (3) erred in holding that, even if the deputies had violated Santos's constitutional rights, they were entitled to qualified immunity for their actions. We address these arguments in turn, reviewing each de novo and viewing facts and all reasonable inferences in the light most favorable to the nonmoving party. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 150 (4th Cir. 2012); Pritchett v. Alford, 973 F.3d 307, 313 (4th Cir. 1992).

11

III.

A.

Regarding the threshold question of whether the encounter constituted a Fourth Amendment seizure, the Supreme Court has identified three categories of police-citizen encounters. United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002). Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification. See id. First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. Florida v. Bostick, 501 U.S. 429, 434 (1991). Second, brief investigative detentions-commonly referred to as "Terry stops"- require reasonable, articulable suspicion of criminal activity. Terry, 392 U.S. at 21. Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause. Devenpeck v. Alford, 53 U.S. 146, 152 (2006).

A police-citizen encounter rises to the level of a Fourth Amendment seizure when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . ." United States v. Jones, 678 F.3d 293, 299 (4th Cir. 2012) (quoting Terry, 392 U.S. at 19 n.16). This inquiry is objective, Weaver, 282 F.3d at 309, asking whether "'in view of all of the circumstances surrounding the incident,

12

a reasonable person would have believed that he was not free to leave.'" Jones, 678 F.3d at 299 (quoting Mendenhall, 446 U.S. at 553). An encounter generally remains consensual when, for example, police officers engage an individual in routine questioning in a public place. United States v. Gray, 883 F.2d 320, 323 (1989); see also Bostick, 501 U.S. at 434 ("[M]ere police questioning does not constitute a seizure.").

We have identified a number of non-exclusive factors to consider in determining whether a police-citizen encounter constitutes a seizure:

> the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as 'routine' in nature."

Jones, 678 F.3d at 299-300 (quoting Gray, 883 F.2d at 322-23). We also consider "the time, place, and purpose" of an encounter. Weaver, 282 F.3d at 310.

Although the inquiry is objective—and thus the subjective feelings of the law enforcement officers and the subject are irrelevant—we also consider certain individual factors that "might have, under the circumstances, overcome that individual's freedom to walk away." Gray, 883 F.2d at 323. For example, in Gray, this Circuit indicated that an individual's lack of

13

familiarity with English may be a relevant consideration. Id.
Nevertheless, "no one factor is dispositive;" rather, we
determine whether an encounter is consensual by considering the
totality of the circumstances. Weaver, 282 F.3d at 310.

B.

Here, Santos argues that she was "seized" for purposes of
the Fourth Amendment when the deputies "surrounded her and began
questioning her." Appellant's Br. at 20. In particular,
Santos emphasizes, among other factors, that the deputies
approached her from opposite sides of the shipping container,
that she was questioned by more than one officer, that the
deputies wore uniforms and carried guns, and that she was
unfamiliar with English. By contrast, the defendants contend
that the deputies' interaction with Santos remained consensual
until after the deputies had been informed of the outstanding
warrant.

The district court decided that Santos was not seized when
the deputies initially approached her. Santos, 884 F. Supp. 2d
at 428. In light of precedent and the totality of the
circumstances before us, we must agree.

The deputies approached Santos during the daytime and in a
public area where employees would "frequently" take breaks or
eat lunch. J.A. 431; see Weaver, 282 F.3d at 312 (finding

14

encounter occurring in "public parking lot in the middle of the day" was consensual); Gray, 883 F.3d at 323-24 (holding that "public setting" diminished coerciveness of police-citizen encounter). They came across Santos as part of a routine patrol, rather than singling her out for investigation. Jones, 678 F.3d at 301 (holding that "routine" encounters are more likely to be consensual than "targeted" encounters). The deputies stood well away from Santos-Deputy Openshaw stood approximately six feet from her, and Deputy Lynch was even farther way, standing near the patrol car-giving her ample space to leave had she elected to do so.

No evidence suggests that the deputies used a commanding or threatening tone in questioning Santos. And the types of questions the deputies posed-asking her for identification, whether she was an employee of the co-op, and whether she was on break-are the types of questions law enforcement officers generally may ask without transforming a consensual encounter into a Fourth Amendment seizure. See United States v. Drayton, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification . . . ."). Finally, the deputies did not touch Santos until they placed her under arrest.

15

Additionally, none of the factors Santos highlighted sufficiently call into question our conclusion that the encounter was consensual at inception. Although two deputies were present, only Openshaw approached and questioned Santos. See United States v. Thompson, 546 F.3d 1223, 1227 (10th Cir. 2008) (holding that encounter was consensual when there were multiple officers present but only one officer approached the individual). Moreover, absent other indicia that an encounter is nonconsensual, the presence of two officers is generally insufficient. Mendenhall, 446 U.S. at 555 (holding that police-citizen encounter was consensual when two officers questioned the individual); Gray, 883 F.2d at 323 (same). And even though the deputies approached her from opposite sides of the shipping container, they stood well back from her, leaving her room to walk away.

Santos also notes that the deputies were wearing standard uniforms and carrying guns. But the deputies never brandished their weapons, and, in some cases, uniforms serve as a "cause for assurance, not discomfort." Drayton, 536 U.S. at 204-05 (noting that "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of [an] encounter absent active brandishing of the weapon"). Finally, although the language barrier may have added to the coerciveness of the situation, because no one factor is dispositive, the language

16

barrier, on its own, is insufficient to turn the otherwise consensual encounter into a seizure. See Weaver, 282 F.3d at 310.

## C.

Even though the encounter initially did not implicate the Fourth Amendment, "[s]ome contacts that start out as constitutional may . . . at some unspecified point, cross the line and become an unconstitutional seizure." Id. at 309. Like the district court, we conclude that the consensual encounter became a Fourth Amendment seizure when Openshaw gestured for Santos to remain seated. Santos, 884 F. Supp. 2d at 428.

Openshaw's gesture "unambiguous[ly]" directed Santos to remain seated. See Brendlin v. California, 551 U.S. 249, 255 (2007) (stating that a seizure occurs "[w]hen the actions of the police . . . show an unambiguous intent to restrain"). As the district court correctly explained, "[u]nder the circumstances, Openshaw's gesture would have communicated to a reasonable person that she was not at liberty to rise and leave." Santos, 884 F. Supp. 2d at 428. Indeed, Santos understood as much, remaining seated after Openshaw's gesture. See United States v. Jones, 562 F.3d 768, 774 (6th Cir. 2009) (holding that individuals were seized for purposes of the Fourth Amendment

17

when they "passively acquiesced" in response to officer's show of authority).

IV.

Having concluded that Santos was seized when Openshaw gestured for her to remain seated, we now must determine whether the deputies violated her constitutional rights when they detained and subsequently arrested her on the civil ICE warrant. Santos argues that her seizure and arrest violated the Fourth Amendment because neither of the deputies was certified or authorized to engage in enforcement of federal civil immigration law.

A.

Before addressing the merits of Santos's constitutional claims, we first must determine whether this question is properly before us on appeal. The defendants contend that Santos abandoned any claim that the deputies' actions constituted the unauthorized enforcement of federal civil immigration law, or, in the alternative, that Santos waived such argument during oral argument on the summary judgment motion. Both arguments are without merit.

First, the defendants argue that Santos abandoned any claim that the deputies had no authority to enforce federal civil

18

immigration law by failing to restyle her action as a <u>Bivens</u> claim after the district court dismissed her initial complaint for failure to state a claim. In the Rule 12(b)(6) dismissal, the district court held that the initial complaint was improperly styled as a Section 1983 action because 8 U.S.C. § 1357(g)(8) provides that a local law enforcement officer "acting under . . . any agreement [with ICE under Section 1357(g)] shall be considered to be acting under color of federal authority for purposes of determining liability . . . in a civil action." J.A. 81. Yet it is undisputed that the deputies were not participating in the Sheriff's Office's Section 1357(g) program with ICE. And Santos avers that they were not acting under color of federal authority. <u>See, e.g.</u>, J.A. 101 ("Defendants Openshaw and Lynch detained [and] arrested Ms. Orellana Santos without the legal authority to do so . . . ."). Accordingly, Santos properly refiled her complaint as a Section 1983 action.

Further, the defendants contend that Santos waived any argument that the deputies lacked authority to make an arrest based on a civil ICE warrant when, during oral argument on the summary judgment motion, her counsel said that "we certainly don't dispute the fact that once . . . the deputies are aware that there is an active warrant, they have probable cause." J.A. 503. But it is not clear from the transcript whether the reference to "active warrant" refers to a civil warrant or a

19

criminal warrant. And earlier during oral argument, Santos's counsel said that local police lack authority to enforce federal immigration laws. Moreover, Santos's summary judgment brief unambiguously argued that the deputies lacked authority to enforce civil federal immigration law. The defendants cite no authority, nor can we find any, holding that an ambiguous statement made during oral argument waives an argument clearly raised in a brief.

## B.

Having concluded that the issue is properly before us, we now address the merits of Santos's claim that the deputies violated her Fourth Amendment rights by seizing and arresting her based on the civil ICE removal warrant. Because the Constitution grants Congress plenary authority over immigration, Johnson v. Whitehead, 647 F.3d 120, 126-27 (4th Cir. 2011), state and local law enforcement officers may participate in the enforcement of federal immigration laws only in "specific, limited circumstances" authorized by Congress, Arizona v. United States, 132 S. Ct. at 2507.

Local law enforcement officers may assist in federal immigration enforcement efforts under 8 U.S.C. § 1357(g)(1), which authorizes the Attorney General to enter into agreements with local law enforcement agencies that allow specific local

20

officers to perform the functions of federal immigration officers. <u>Arizona v. United States</u>, 132 S. Ct. at 2506. Even in the absence of a written agreement, local law enforcement agencies may "cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B). When enforcing federal immigration law pursuant to Section 1357(g), local law enforcement officers are "subject to the direction and supervision of the Attorney General." § 1357(g)(3).

Other statutory provisions authorize local law enforcement officers to engage in immigration enforcement in more circumscribed situations. <u>See, e.g.</u>, § 1103(a)(10) (allowing the Attorney General to authorize local law enforcement officers to assist in immigration enforcement in the event of an "actual or imminent mass influx of aliens arriving off the coast of the United States"); § 1252c(a) (authorizing local law enforcement officers to arrest illegally present aliens who have "previously been convicted of a felony in the United States and deported or left the United States after such conviction"); § 1324(c) (allowing local law enforcement officers to arrest individuals for bringing in and harboring certain aliens).

Although not clearly addressed by federal statute, state and local law enforcement officers also may be able to

21

investigate, detain, and arrest individuals for criminal violations of federal immigration law. In particular, before Arizona v. United States, some Circuits held that neither the Fourth Amendment nor federal immigration law precludes state and local enforcement of federal criminal immigration law. See, e.g., United States v. Vasquez-Alvarez, 176 F.3d 1294, 1296 (10th Cir. 1999). And we have indicated that local law enforcement officials may detain or arrest an individual for criminal violations of federal immigration law without running afoul of the Fourth Amendment, so long as the seizure is supported by reasonable suspicion or probable cause and is authorized by state law. United States v. Guijon-Ortiz, 660 F.3d 757, 764 & 764 n.3 (4th Cir. 2011). But we have not had occasion to address whether federal immigration law preempts state and local officers from enforcing federal criminal immigration laws. And the Supreme Court has expressly left that question open. Arizona v. United States, 132 S. Ct. at 2509.

Although the Supreme Court has not resolved whether local police officers may detain or arrest an individual for suspected criminal immigration violations, the Court has said that local officers generally lack authority to arrest individuals suspected of civil immigration violations. Noting that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," the Supreme Court concluded that

22

"[i]f the police stop someone based on nothing more than possible removability, the usual predicate for arrest is absent." Id. at 2505. Relying on this rule, the Supreme Court held unconstitutional a provision in an Arizona statute that authorized a state officer to "'without a warrant . . . arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States.'" Id. (quoting Ariz. Rev. Stat. Ann. § 13-3883(A)(5)).

Lower federal courts have universally-and we think correctly-interpreted Arizona v. United States as precluding local law enforcement officers from arresting individuals solely based on known or suspected civil immigration violations. See Melendres v. Arpaio, 695 F.3d 990, 1001 (9th Cir. 2012); Melendres v. Arpaio, No. PHX-CV-07-02513-GMS, 2013 WL 2297173, at *60-63 (D. Ariz. May 24, 2013); Buquer v. City of Indianapolis, No. 1:11-cv-00708-SEB-MJD, 2013 WL 1332158, at *10-11 (S.D. Ind. Mar. 28, 2013).

The rationale for this rule is straightforward. A law enforcement officer may arrest a suspect only if the officer has "'probable cause' to believe that the suspect is involved in criminal activity." Brown v. Texas, 443 U.S. 47, 51 (1979). Because civil immigration violations do not constitute crimes, suspicion or knowledge that an individual has committed a civil

23

immigration violation, by itself, does not give a law enforcement officer probable cause to believe that the individual is engaged in criminal activity. Melendres, 695 F.3d at 1000-01. Additionally, allowing local law enforcement officers to arrest individuals for civil immigration violations would infringe on the substantial discretion Congress entrusted to the Attorney General in making removability decisions, which often require the weighing of complex diplomatic, political, and economic considerations. See Arizona v. United States, 132 S. Ct. at 2506-07.

Although Arizona v. United States did not resolve whether knowledge or suspicion of a civil immigration violation is an adequate basis to conduct a brief investigatory stop, the decision noted that "[d]etaining individuals solely to verify their immigration status would raise constitutional concerns." Id. at 2509. Nonetheless, the Court's logic regarding arrests readily extends to brief investigatory detentions. In particular, to justify an investigatory detention, a law enforcement officer must have reasonable, articulable suspicion that "criminal activity may be afoot." Terry, 392 U.S. at 30. And because civil immigration violations are not criminal offenses, suspicion or knowledge that an individual has committed a civil immigration violation "alone does not give

24

rise to an inference that criminal activity is 'afoot.'" Melendres, 695 F.3d at 1001.

Therefore, we hold that, absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law.

Like the district court, we conclude that the deputies seized Santos for purposes of the Fourth Amendment when Deputy Openshaw gestured for her to stay seated after dispatch informed him of the outstanding civil ICE deportation warrant. See supra Part III.C. At that time, the deputies' only basis for detaining Santos was the civil ICE warrant. Yet as the defendants concede, the deputies were not authorized to engage in immigration law enforcement under the Sheriff's Office's Section 1357(g)(1) agreement with the Attorney General. They thus lacked authority to enforce civil immigration law and violated Santos's rights under the Fourth Amendment when they seized her solely on the basis of the outstanding civil ICE warrant.

C.

We find unpersuasive the defendants' arguments that the deputies lawfully detained and arrested Santos. First, the

25

defendants contend that the deputies properly seized Santos pursuant to Section 1357(g)(10), which, as previously explained, allows state law enforcement officers to "cooperate" with the federal government in immigration enforcement, even when officers are not expressly authorized to do so under a Section 1357(g)(1) agreement. In Arizona v. United States, the Supreme Court concluded that "no coherent understanding of ['cooperate' in Section 1357(g)(10)] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." 132 S. Ct. at 2507. Thus, Arizona v. United States makes clear that under Section 1357(g)(10) local law enforcement officers cannot arrest aliens for civil immigration violations absent, at a minimum, direction or authorization by federal officials.

The defendants assert that Santos's detention and arrest was lawful under Section 1357(g)(10) because "there is no dispute that ICE . . . directed the Deputies to detain Santos and to transfer her to the ICE detention facility . . . ." Appellee's Br. at 48. Although there may be no dispute as to whether ICE directed the deputies to detain Santos at some point, the key issue for our purposes is when ICE directed the deputies to detain her. We conclude that the deputies seized Santos when Deputy Openshaw told her to remain seated-after they

26

had learned of the outstanding ICE warrant but before dispatch confirmed with ICE that the warrant was active. See supra Part III.C. Indeed, ICE's request that Santos be detained on ICE's behalf came fully forty-five minutes after Santos had already been arrested. Therefore, it is undisputed that the deputies' initial seizure of Santos was not directed or authorized by ICE.

And the ICE detainer does not cleanse the unlawful seizure, because "[t]he reasonableness of an official invasion of [a] citizen's privacy must be appraised on the basis of the facts as they existed at the time that invasion occurred." United States v. Jacobsen, 466 U.S. 109, 115 (1984); see also Beck v. Ohio, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." (emphasis added)).

The defendants also suggest that in Guijon-Ortiz and United States v. Soriano-Jarquin, 492 F.3d 495 (4th Cir. 2007), this Court established that evidence of "unlawful[] presen[ce]" constitutes reasonable suspicion to detain an individual pending transport to ICE. Appellee's Br. at 40. The defendants'

27

reliance on Guijon-Ortiz and Soriano-Jarquin, both of which were decided before Arizona v. United States, is misplaced.

The defendants correctly note that in Guijon-Ortiz we said that a county sheriff's deputy had reasonable suspicion to arrest the defendant for "unlawful . . . presence in the country" when, during the course of a lawful traffic stop, the deputy learned that the defendant had presented him with a fraudulent green card. 660 F.3d at 765. Guijon-Ortiz is inapposite because the deputy had reasonable suspicion that the defendant violated a criminal provision of federal immigration law-knowingly using a false or fraudulent immigration identification card in violation of 18 U.S.C. § 1546(a), id. at 763 n.3-not a civil provision, as was the case here. Further, in Guijon-Ortiz the deputy detained and transported the defendant only after being expressly directed to do so by ICE, id. at 760, which, as previously explained, was not the case here.

In Soriano-Jarquin, we considered whether a state police officer violated the Fourth Amendment when, during a lawful traffic stop, the officer asked passengers in a van for identification. 492 F.3d at 496. After being advised by the driver of the van that the passengers were illegal aliens and while diligently pursuing the independent basis for the traffic stop, the officer contacted ICE, which directed him to detain

28

the van pending arrival of ICE agents.  Id. at 496-97.
Therefore, like Guijon-Ortiz, Soriano-Jarquin is readily
distinguishable because the police officer detained the
passengers at ICE's express direction.

Third, the defendants assert that the deputies lawfully
detained Santos because there is no evidence in the record that
the ICE warrant was civil rather than criminal.  But the
deputies testified that the warrant was for "deportation."  And
the Supreme Court has long characterized deportation as a civil
proceeding.  See, e.g., Padilla v. Kentucky, 130 S. Ct. 1473,
1481 (2010);[3] United States ex rel. Bilokumsky v. Tod, 263 U.S.
149, 155 (1923).  Therefore, the record does indeed contain
evidence the ICE warrant was civil in nature.

More significantly, even if the record had been devoid of
evidence regarding whether the warrant was civil or criminal,
the defendants' argument misses the mark because law enforcement
officers, not detainees, are responsible for identifying
evidence justifying a seizure.  United States v. Branch, 537
F.3d 328, 337 (4th Cir. 2008) ("In order to demonstrate
reasonable suspicion, a police officer must offer 'specific and

---

[3] Padilla characterizes "removal" as a civil proceeding.
130 S. Ct. at 1481.  In 1996, Congress combined "deportation"
proceedings with "exclusion" proceedings to form a single
"removal" proceeding.  Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, Pub. L. 104-208, § 304(a), 110 Stat.
3009-587, adding 8 U.S.C. § 1229a.

29

articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000))). Consequently, when affirmative evidence does not justify a seizure, the seizure violates the Fourth Amendment. Therefore, it was the deputies' responsibility to determine whether the warrant was for a criminal or civil immigration violation before seizing Santos. And because they did not determine that the warrant was criminal in nature (nor could they have—because it was not), her detention was unlawful.

Relatedly, the defendants suggest that the ICE warrant was criminal because it was included in the National Crime Information Center ("NCIC") database and "the enabling legislation for the NCIC provides only that crime records can be entered into the database." Appellee's Br. at 48 (citing 28 U.S.C. § 534(a)). We agree with the defendants that there is a good argument that Section 534(a)(1), which directs the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records," does not authorize inclusion of civil immigration records in the NCIC database. See Doe v. Immigration & Customs Enforcement, 2006 WL 1294440, at *1-3 (S.D.N.Y. May 10, 2006) (explaining that the plain language of Section 534, ordinary canons of statutory construction, and legislative history

30

demonstrate that the government lacks authority to include civil immigration records in the NCIC database); Michael J. Wishnie, State and Local Police Enforcement of Immigration Laws, 6 U. Pa. J. Const. L. 1084, 1095-1101 (2004) (same).

Nonetheless, in the aftermath of the September 11, 2001 attacks, the Attorney General authorized inclusion of civil immigration records in the NCIC database, including information on individuals, like Santos, who are the subject of outstanding removal orders. John Ashcroft, U.S. Att'y Gen., Prepared Remarks on the National Security Entry-Exit Registration System (June 6, 2012), available at http://www.justice.gov/archive/ag/speeches/2002/060502agprepared remarks.htm. And ICE continues to populate the NCIC database with civil immigration records to the present. See Immigration & Customs Enforcement, Fact Sheet: Law Enforcement Support Center (May 29, 2012), http://www.ice.gov/news/library/factsheets/lesc.htm. Therefore, contrary to the defendants' assertion, the NCIC database does indeed include civil immigration records.

In sum, the deputies violated Santos's rights under the Fourth Amendment when they seized her after learning that she was the subject of a civil immigration warrant and absent ICE's express authorization or direction.

V.

A.

Even though the deputies violated Santos's rights under the Fourth Amendment, the deputies still may be entitled to qualified immunity if the right was not clearly established at the time of the seizure.

The doctrine of qualified immunity "balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). To that end, qualified immunity protects law enforcement officers from personal liability for civil damages stemming from "bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." Willingham v. Crooke, 412 F.3d 553, 558 (4th Cir. 2005) (internal quotation omitted).

We apply a two-step test to determine whether a municipal employee is entitled to qualified immunity. First, we decide "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the [government official's] actions violated a constitutional right." Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013). If we determine that a violation occurred, we consider whether the

32

constitutional right was "clearly established" at the time of the government official's conduct. Id. (noting also that the Supreme Court "modif[ied] the . . . approach such that lower courts are no longer required to conduct the analysis in th[is] sequence").

As explained above, the deputies violated Santos's Fourth Amendment rights when they seized her based on the civil ICE warrant. See supra Part IV.B. Therefore, the key question is whether the constitutional right was "clearly established" when the arrest occurred. We apply an objective test to determine whether a right is "clearly established," asking whether "a reasonable person in the official's position could have failed to appreciate that his conduct would violate [the] right[]." Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th Cir. 1991) (internal quotation omitted).

Because government officials cannot "reasonably be expected to anticipate subsequent legal developments," the right must have been clearly established at the time an official engaged in a challenged action. Harlow, 457 U.S. at 818. Nonetheless, there need not have been a judicial decision squarely on all fours for a government official to be on notice that an action is unconstitutional. Meyers, 713 F.3d at 734 (noting that this Court "repeatedly ha[s] held that it is not required that a right violated already have been recognized by a court in a

33

specific context before such right may be held 'clearly established' for purposes of qualified immunity"); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (stating that "officials can still be on notice that their conduct violates established law even in novel factual circumstances").

For three reasons, we conclude that when the deputies detained Santos, it was not clearly established that local law enforcement officers may not detain or arrest an individual based solely on a suspected or known violation of federal civil immigration law. First, the Supreme Court did not directly address the role of state and local officers in enforcement of federal civil immigration law until Arizona v. United States, which was decided more than three years after the deputies' encounter with Santos.

Second, until today, this Court had not established that local law enforcement officers may not seize individuals for civil immigration violations. Therefore, no controlling precedent put the deputies on notice that their actions violated Santos's constitutional rights.

And finally, before Arizona v. United States, our Sister Circuits were split on whether local law enforcement officers could arrest aliens for civil immigration violations. Compare, e.g., United States v. Urrieta, 520 F.3d 569, 574 (6th Cir. 2008) ("To justify [the defendant's] extended detention then,

34

the government must point to specific facts demonstrating that [the Sheriff's] Deputy . . . had a reasonable suspicion that [the defendant] was engaged in some nonimmigration-related illegal activity."), with United States v. Vasquez-Alvarez, 176 F.3d 1294, 1296 (10th Cir. 1999) ("[T]his court has held that state law-enforcement officers have the general authority to make arrests for violations of federal immigration laws."). And "if there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes." Rogers v. Pendleton, 249 F.3d 279, 288 (4th Cir. 2001).

In sum, even though the deputies unconstitutionally seized Santos, qualified immunity bars her individual capacity claims because the right at issue was not clearly established at the time of the encounter.

B.

Santos further argues that even if qualified immunity precludes her individual capacity claims, the district court improperly dismissed her claims against the Frederick County Board of Commissioners and against Sheriff Jenkins and Deputies Openshaw and Lynch in their official capacities. Plaintiffs

35

alleging constitutional injuries may bring suits under Section 1983 against municipalities for unconstitutional actions taken by their agents and employees. Monell v. Dep't of Social Servs. of the City of New York, 436 U.S. 658, 691 (1978). Likewise, a plaintiff may bring a Section 1983 action against governmental officials in their official or representative capacity. Hafer v. Melo, 502 U.S. 21, 25 (1991). For purposes of Section 1983, these official-capacity suits are "treated as suits against the [municipality]." Id.

The Supreme Court has emphasized, however, that municipal liability under Section 1983 does not amount to respondeat superior. Monell, 436 U.S. at 691. Consequently, a municipality is subject to Section 1983 liability only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury . . . ." Id. at 694. The requirement that the allegedly unconstitutional act stems from an established municipal policy or the actions of a final policymaker ensures that the municipality is "responsible" for the alleged violations of a plaintiff's constitutional rights. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).

Unlike with government officials sued in their individual capacity, qualified immunity from suit under Section 1983 does not extend to municipal defendants or government employees sued

36

in their official capacity. Owen v. City of Independence, Mo., 445 U.S. 622, 650 (1980).

The district court dismissed Santos's official-capacity claims and claims against the Frederick County Board of Commissioners because it concluded that the deputies did not violate Santos's Fourth Amendment rights. Santos, 884 F. Supp. 2d at 432. Because we hold that the deputies violated Santos's Fourth Amendment rights when they seized her solely on the basis of the civil ICE warrant and because qualified immunity does not extend to municipal defendants, this was error.

Having (erroneously) determined that the deputies did not violate Santos's constitutional rights, the district court did not have occasion to address whether the municipal defendants were "responsible" for the deputies' conduct. Therefore, on remand, the district court should determine whether the deputies' unconstitutional actions are attributable to an official policy or custom of the county or the actions of a final county policymaker.

VI.

In sum, the district court correctly concluded that the deputies seized Santos when Openshaw gestured for her to remain seated after the deputies learned of the outstanding civil ICE removal warrant. But because knowledge that an individual has

37

committed a civil immigration violation does not constitute reasonable suspicion or probable cause of a criminal infraction, the district court erred in holding that Santos's seizure did not violate the Fourth Amendment.

Nonetheless, the deputies are entitled to qualified immunity because the right at issue was not clearly established at the time of the encounter. Qualified immunity does not extend, however, to municipal defendants, and thus the district court erred in dismissing Santos's municipal and official-capacity claims.

Therefore, we affirm the district court's decision regarding Santos's individual-capacity claims, vacate its decision regarding her municipal and official-capacity claims, and remand the case to the district court for further proceedings in accordance with this opinion.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED