SARAH EVANS BARKER, JUDGE
Plaintiff Antonio Lopez-Aguilar ("Lopez-Aguilar") brought a Fourth Amendment claim for unlawful seizure under 42 U.S.C. § 1983 against the Marion County Sheriff's Department, the Marion County Sheriff, and a Sheriff's Department sergeant (together, "Marion County") arising from Lopez-Aguilar's detention in 2015 by Marion County, allegedly under a detention request or "immigration detainer" issued by U.S. Immigrations and Customs Enforcement (ICE).
Before the Court is a Stipulated Final Judgment and Order for Permanent Injunction submitted by the parties for approval ("the Stipulated Judgment"). The Stipulated Judgment is for declaratory and injunctive relief, specifically, for a declaration that Marion County's compliance with ICE detainers and immigration-court removal orders without criminal probable *964 cause violates the Fourth Amendment, and for a permanent injunction enjoining Marion County from complying with ICE detainers and immigration-court removal orders without criminal probable cause.
The United States has filed a Statement of Interest[1] in opposition to the Stipulated Judgment. Each party has now filed a response. After due consideration, we find the Stipulated Judgment warrants this Court's approval.
Factual and Procedural History
Lopez-Aguilar's Complaint alleges the following.[2] Lopez-Aguilar lives in Allen County, Indiana. Pl.'s Compl. (Dkt. 1) ¶ 8. On September 18, 2014, Lopez-Aguilar came to Indianapolis, Marion County, Indiana, to attend a hearing in Marion Superior Court on a criminal misdemeanor charge of driving without a license. Id. ¶ 12. Lopez-Aguilar was represented by counsel at the hearing. Id. ¶ 13.
Upon arriving at the courthouse in Indianapolis, Lopez-Aguilar and his lawyer were informed that an ICE officer had visited the courthouse earlier that day inquiring about Lopez-Aguilar. Id. Lopez-Aguilar was thereafter taken into custody by "Davis," id. ¶ 15, a sergeant of the Marion County Sheriff's Department. Id. ¶ 11. Davis put Lopez-Aguilar in "a locked, secure prisoner holding area." Id. ¶ 15. Sometime later (Lopez-Aguilar does not allege how long he was detained after arriving at the courthouse), Lopez-Aguilar appeared before the court and "resolve[d]" his misdemeanor charge. Id. Though the precise disposition of that offense is not alleged, it did not result in Lopez-Aguilar's incarceration or in "a court order requiring his incarceration." Id. ¶ 16.
Following the hearing, Davis again took Lopez-Aguilar into custody, informing him that he would be held until he could be transferred to ICE's custody. Id. ¶ 17. Lopez-Aguilar was transported directly to the Marion County jail and held there until the next day, September 19, 2014, when he was transferred to ICE's custody. Id. ¶ 23. Lopez-Aguilar was not charged with any crime nor taken before any judicial officer, id. ¶ 18, and Marion County had no independent cause to seize or hold Lopez-Aguilar. Id. ¶ 19. Sometime after ICE took custody of him (Lopez-Aguilar does not allege precisely when), ICE released Lopez-Aguilar on his own recognizance. Id. ¶ 23. An "immigration case" of unspecified character was pending against him at the time his complaint was filed. Id.
After Lopez-Aguilar was taken into custody the second time, Lopez-Aguilar's lawyer complained to Davis and other Marion County officers, including the Marion County Sheriff. Id. ¶ 20. That evening, September 18, 2014, a lawyer for Marion County called Lopez-Aguilar's lawyer and said that Lopez-Aguilar would be held in the county jail until he could be transferred to ICE's custody. Id. ¶ 21. Lopez-Aguilar believes that the Marion County lawyer "spoke with the knowledge of, at the behest of, and on behalf of" the Marion County Sheriff. Id. ¶ 22.
*965 Attached to the Statement of Interest submitted by the United States is a document purporting to be the "Declaration of Kevin Wies." Wies Aff. (Dkt. 42 Ex. 1).[3] Wies says that he was the ICE agent responsible for Lopez-Aguilar's immigration arrest and detention on September 18-19, 2014. Id. ¶¶ 4-6. Wies denies that a "written [ ]or informal detainer" was ever issued for Lopez-Aguilar. Id. ¶ 7. Rather, Wies says, this case involves "the practice of oral requests made by ICE to [Marion County] to contact ICE if an individual wanted by ICE shows up to court after the ICE representative has to leave." Id. ¶ 2. In other words, according to Wies, Wies never asked Marion County to detain Lopez-Aguilar, formally or informally; he only asked Marion County to communicate with him about Lopez-Aguilar.
Specifically, Wies avers, "[o]n December 26, 2013, a Secure Communities referral based on a fingerprint match was sent to the [ICE office in Indianapolis] for Antonio Aguilar-Lopez [sic ] (herein after 'Aguilar') [sic ]." Id. ¶ 3. Presumably Wies means Lopez-Aguilar. Wies continues: "Secure Communities was a program that cross-matched fingerprints taken during a criminal arrest with fingerprints taken for immigration purposes." Id. Lopez-Aguilar's fingerprints had been taken in connection with his criminal matter in Marion Superior Court, id. , and were apparently matched to prints taken "during an earlier immigration encounter." Id. Once a fingerprint match was made, "the Secure Communities unit would send the information to the appropriate ICE agent to determine if any action should be taken."Id. Wies nowhere says what he intended to investigate Lopez-Aguilar for or what action Wies proposed to take. Wies never says that Lopez-Aguilar was subject to a removal order, an immigration warrant, or that ICE had reason to believe that Lopez-Aguilar was removable. So far as appears from his affidavit, Wies's purpose in wishing to engage with Lopez-Aguilar was simply "to determine if any action should be taken." Id.
On September 18, 2014, Wies says he went to Marion Superior Court "and attempted to make contact" with Lopez-Aguilar at the courthouse. Id. ¶ 4. It is Wies's "understanding" that Lopez-Aguilar and his lawyer "purposely arrived late" to the courthouse in order to avoid ICE. Id. Wies asked "a Marion County Sheriff's Department employee," presumably Davis, to notify Wies by text message if Lopez-Aguilar arrived at the courthouse. Id. Later the same day, Wies received a text message stating that Lopez-Aguilar had arrived at the courthouse. Id. ¶ 5. Wies "was at the courthouse and speaking to [Lopez-Aguilar] within 25-30 minutes of *966 receiving the text." Id. Lopez-Aguilar "freely admitted to [Wies] to being a citizen and national of El Salvador without the proper immigration documents allowing him to be present or remain in the United States." Id. Lopez-Aguilar further "made no claims to United States citizenship, legal permanent residence, or military service[,]" nor to having attended "school in the United States." Id. Wies then arrested Lopez-Aguilar "within five to ten minutes of making contact with him." Id. ¶ 6. Wies says that he transported Lopez-Aguilar to the Marion County jail; that that the arrest "was an ICE arrest[,]" id. ; that Lopez-Aguilar "was never out of ICE custody[,]" id. ; and that Lopez-Aguilar was held in the Marion County jail "as a federal inmate" under an "Intergovernmental Agreement" between ICE and Marion County. Id. ¶ 8.
Wies's account is disputed by a document attached to Lopez-Aguilar's response to the government's Statement of Interest purporting to be the "Affidavit of Jorge L. Rodriguez," Rodriguez Aff. (Dkt. 47 Ex. 3), who was Lopez-Aguilar's lawyer at the September 18, 2014, hearing in Marion Superior Court. Id. ¶ 4. Rodriguez is "a solo practitioner ... practic[ing] mainly in the areas of criminal and immigration law." Id. ¶ 3. Through his immigration practice, Rodriguez is "personally familiar with Kevin Wies" and believes himself to have a "good relationship" with Wies. Id. ¶ 5. Nevertheless, Rodriguez avers, "many of the statements contained in [Wies's] declaration are not true." Id. ¶ 6.
Rodriguez and Lopez-Aguilar concede that they were late to court, but not to avoid ICE, but because Rodriguez came from a late-running hearing in Hamilton County and because Lopez-Aguilar at first went to the wrong Marion Superior Court courthouse. Id. ¶ 7. Moreover, Wies did not arrive within thirty minutes of receiving a text message from Davis; rather, Wies arrived within two hours of receiving a phone call from Davis lasting several minutes, which Rodriguez observed and overheard. Id. ¶ 8. After the phone call, Lopez-Aguilar was detained by Davis, allowed to appear before the court for his misdemeanor hearing, and then again detained by Davis. Id. Finally, "from [his] practice and experience," Rodriguez has observed that jail transportations by ICE are made by car, while jail transportations by Marion County are made by van. Id. ¶ 9. Because Lopez-Aguilar "clearly recalls being transported to the Marion County Jail in the back of a van," Rodriguez believes that he was transported to the jail by Marion County, not by Wies or another ICE agent. Id.
On September 15, 2016, Lopez-Aguilar filed his complaint in this court against Davis, the Marion County Sheriff, and the Marion County Sheriff's Department, claiming that "[t]he defendants arrested and held [Lopez-Aguilar] in custody, without cause, in violation of the Fourth Amendment" under 42 U.S.C. § 1983 and that the defendants committed false arrest and false imprisonment under Indiana tort law. Pl.'s Compl. ¶¶ 26-27. Lopez-Aguilar seeks damages, costs, and fees. Id. at 5.
On July 10, 2017, the parties jointly submitted their Stipulated Judgment. Stip. J. (Dkt. 37). The Stipulated Judgment rests primarily on this Court's decision in Buquer v. City of Indianapolis , No. 1:11-cv-708, 2013 WL 1332158 (S.D. Ind. Mar. 28, 2013) (Barker, J.). That decision considered the constitutionality inter alia of Section 20 of Indiana's 2011 Senate Enrolled Act 590. Buquer , 2013 WL 1332158, at *1. Section 20 purported to authorize state law enforcement officers to arrest any person on the basis of
a removal order issued for the person by an immigration court[,] a detainer or *967 notice of action for the person issued by [federal authorities,] or probable cause to believe that the person has been indicted for or convicted of one ... or more aggravated felonies [as defined by federal immigration law].
Id. at *2 (quoting Ind. Code § 35-33-1-1(a)(11) through (13) (2011) ). Buquer held that Section 20 was preempted by the federal Immigration and Nationality Act (INA). Id. at *10. In the alternative, because Section 20 "authorize[d] the warrantless arrest of persons for matters and conduct that are not crimes[,] and because "such power contravenes the Fourth Amendment," Buquer held Section 20 unconstitutional on that ground as well. Id. at *11.
The parties seek to give effect to Buquer's Fourth Amendment holding as to Marion County by and through the Stipulated Judgment. Lopez-Aguilar alleges that he was seized within the meaning of the Fourth Amendment by Marion County at ICE's request without probable cause to believe he had committed a crime. Pl.'s Compl. ¶ 26; Stip. J. 1-2. If true, the parties agree that these facts make out a constitutional violation under Buquer . Stip. J. 2. However, "[a]lthough this Court's reasoning in the Buquer case answers the central legal question presented here, the facts are disputed[,]" id. , as is Marion County's defense of qualified immunity. Id. "In order to clarify [Marion County's] obligation under the law and to put this litigation fully to rest," id. the parties respectively agree and jointly seek from this Court:
1. a declaration "that seizures by [Marion County] based solely on detention requests from ICE (in whatever form) or removal orders from an immigration court violate the Fourth Amendment unless ICE supplies, or [Marion County] otherwise possess[es], probable cause that the individual to be detained has committed a criminal offense," id. at 4; and
2. a permanent injunction enjoining Marion County "from seizing or detaining any person based solely on detention requests from ICE (in whatever form) or removal orders from an immigration court unless ICE supplies a warrant signed by a judge or otherwise supplies probable cause that the individual identified in the [detention request] has committed a criminal offense. For the avoidance of doubt, an ICE request that [Marion County] seize or hold an individual in custody based solely on a civil immigration violation does not justify a Fourth Amendment seizure."Id.
The parties agree further that, in exchange for the above relief, Lopez-Aguilar will "abandon[ ] his claims for damages under Section 1983, his claim for attorneys' fees, and his state-law tort claims." Id. The parties seek the dismissal of those claims with prejudice. Id.
Standard of Decision
Parties may settle litigation by entry of a consent decree, consent judgment, or stipulated judgment.[4] "A consent *968 decree is a court order that embodies the terms agreed upon by the parties as a compromise to litigation." United States v. Alshabkhoun , 277 F.3d 930, 934 (7th Cir. 2002). A district must approve a proposed consent decree if its terms are sufficiently connected to the underlying suit and if it is otherwise fair and reasonable.
In reviewing a proposed consent decree, the court begins from "the federal policy encouraging settlement." United States v. George A. Whiting Paper Co. , 644 F.3d 368, 372 (7th Cir. 2011). Then the court "must determine whether a proposed decree is lawful, fair, reasonable, and adequate." E.E.O.C. v. Hiram Walker & Sons, Inc. , 768 F.2d 884, 889 (7th Cir. 1985). "The district court may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate[,]" id. , and should be "chary" of so finding. Id. at 890.
But a federal court is more than " 'a recorder of contracts' from whom parties can purchase injunctions[.]" Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland , 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (citation omitted). As the judgment of a federal court, a consent decree "is an exercise of federal power, enforceable by contempt." Kasper v. Bd. of Election Comm'rs , 814 F.2d 332, 338 (7th Cir. 1987). Predicate to the exercise of federal power, a consent decree must "(1) spring from and serve to resolve a dispute within the court's subject matter jurisdiction; (2) come within the general scope of the case made by the pleadings; and (3) further the objectives of the law upon which the complaint was based." Komyatti v. Bayh , 96 F.3d 955, 960 (7th Cir. 1996) (quotations and alterations omitted) (quoting Local No. 93 , 478 U.S. at 525, 106 S.Ct. 3063 ).
If Local No. 93 is satisfied, "the parties may create any obligations that are not forbidden by law." Kasper , 814 F.2d at 342. It is well established that such obligations may be "more than what a court would have ordered absent the settlement." Rufo v. Inmates of Suffolk Cnty. Jail , 502 U.S. 367, 389, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). More specifically, a consent decree may impose obligations "beyond those imposed directly by the Constitution itself[,]" so long as they are "related to elimination of the condition that is alleged to offend the Constitution." Komyatti , 96 F.3d at 959 (citing Rufo , 502 U.S. at 389, 112 S.Ct. 748 ).
More is required, though, when compliance with a consent decree would require a state- or local-government defendant to violate state law. Such an "alteration" of state law "may not be based on consent alone; it depends on an exercise of federal power [under the Supremacy Clause of the Constitution], which in turn depends on a violation of federal law." Kasper , 814 F.2d at 338. Accordingly, a consent decree requiring a government defendant's violation of state law must be necessary to remedy a probable violation of federal law, the existence of which must be supported by particularized findings. Perkins v. City of Chicago Heights , 47 F.3d 212, 217 (7th Cir. 1995) ; Evans v. City of Chicago , 10 F.3d 474, 480 (7th Cir. 1993) (en banc ); People Who Care v. Bd. of Educ. , 961 F.2d 1335, 1339 (7th Cir. 1992) ; Kasper , 814 F.2d at 342 ; see also Lawyer v. U.S. Dep't of Justice , 521 U.S. 567, 572, 574, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997).
In sum, the Stipulated Judgment must be approved if it (1) is fair and reasonable;
*969 (2) springs from and helps resolve a case within this Court's jurisdiction, comes within the case made by Lopez-Aguilar's complaint, furthers Fourth Amendment values, and orders a remedy, if not required by the Constitution, that is related to the elimination of an allegedly constitutionally offensive practice; and, (3) if found to require Marion County to violate Indiana law, is necessary to remedy a probable violation of the Fourth Amendment.
Analysis
We shall review basic immigration-law background before applying the framework for the approval of consent decrees set out above to the Stipulated Judgment. We conclude, first, that the Stipulated Judgment does not require Marion County to violate Indiana law, and, second, that the Stipulated Judgment otherwise merits approval.
I. Immigration-Law Background
"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens[,]" Arizona v. United States , 567 U.S. 387, 394, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), "subject to important constitutional limitations." Zadvydas v. Davis , 533 U.S. 678, 695, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). "Federal governance of immigration and alien status is extensive and complex." Arizona , 567 U.S. at 395, 132 S.Ct. 2492. The "comprehensive federal statutory scheme for regulation of immigration and naturalization" is embodied in the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq . Buquer v. City of Indianapolis , No. 1:11-cv-708, 2013 WL 1332158, at *1 (S.D. Ind. Mar. 28, 2013) (quoting Chamber of Commerce of the United States v. Whiting , 563 U.S. 582, 587, 131 S.Ct. 1968, 179 L.Ed.2d 1031 (2011) ). In the INA,
Congress has specified which aliens may be removed from the United States and the procedures for doing so. Aliens may be removed [and are removable] if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law. Removal is a civil, not criminal, matter. A principal feature of the removal system is the broad discretion exercised by immigration officials.
Arizona , 567 U.S. at 396, 132 S.Ct. 2492 (citations omitted). "Unlawful entry and unlawful reentry into the country are federal [criminal] offenses." Id. at 395, 132 S.Ct. 2492. But "[a]s a general, rule it is not a crime for a removable alien to remain present in the United States." Id. at 407, 132 S.Ct. 2492.
Lopez-Aguilar alleges he was detained by Marion County under an immigration detainer formally or informally issued by ICE, and the Stipulated Judgment addresses detainers as well as immigration-court removal orders. Both are reviewed briefly here.
A. Immigration Detainers
"An immigration detainer is a piece of paper issued by immigration officials that purports to command other law enforcement officials to hold a prisoner, who otherwise would be released, in custody and deliver that person to federal immigration officials." Christopher N. Lasch, Federal Immigration Detainers After Arizona v. United States, 46 Loy. L.A. L. Rev. 629, 634 (2013). It is "the principle mechanism for [ICE] ... to obtain custody over suspected immigration violators in the custody of state or local law enforcement officials." Id. at 675. If ICE is informed "that an alien is in custody on non-immigration related charges, ICE may issue a detainer requesting that the law enforcement agency hold the individual for up to 48 hours *970 (not including weekend days and holidays) beyond the time that the detainee would otherwise be released in order to allow ICE to assume custody[.]" Buquer , 2013 WL 1332158, at *3.
In this form, ICE detainers are a creature of regulation. See 8 C.F.R. § 287.7 ("the detainer regulation").
(a) Detainers in general. ... Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer-Notice of Action, to any other Federal, State, or local law enforcement agency. A detainer serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible. ...
(d) Temporary detention and Department request. Upon a determination by the Department [of Homeland Security] to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.
8 C.F.R. § 287.7(a), (d).
Detainers under the INA are far more limited. See 8 U.S.C. § 1357(d) ("the detainer statute"). The detainer statute expressly authorizes only the issuance of detainers at the request of local, state, or federal agencies who have custody of noncitizens who have committed "violation[s] of controlled substances laws[.]" Id. Moreover, under the detainer statute, if a detainer issues for a noncitizen "not otherwise detained ..., the Attorney General[5] shall effectively and expeditiously take custody of the alien." Id. The detainer regulation, by contrast, provides that, if a detainer issues for a noncitizen "not otherwise detained ...," the local, state, or federal agency holding the noncitizen "shall maintain custody ...." 8 C.F.R. § 287.7(d). In other words, the detainer statute authorizes state communication with federal authorities; the detainer regulation authorizes state detention on behalf of federal authorities.
B. Immigration-Court Removal Orders
The INA authorizes the Attorney General to order the removal of a noncitizen who belongs to one or more certain specified classes of removable aliens. 8 U.S.C. § 1227(a). A noncitizen may be "released on bond or conditional parole" "during the pendency of the removal proceedings[ ] or even after [a] removal order has been issued by an immigration judge."
*971 Buquer , 2013 WL 1332158, at *2. A noncitizen subject to a nonfinal removal order may seek "reconsideration as well as administrative and judicial review" of the order before it becomes final. Id. Upon the issuance of a final removal order by an immigration court, a "Warrant of Removal ... will be issued" by ICE. 8 CFR § 241.2(a)(1).
Failing to observe a deportation order may subject its target to criminal liability for failure to depart, if the failure is willful and the deportation order has been final for 90 days. 8 U.S.C. § 1253(a). But the validity of the order may be challenged in a subsequently instituted criminal proceeding pursuant to 8 U.S.C. § 1252(b)(7)(A), and "[e]ven after issuance of a final removal order, the individual may, in some circumstances, move to reopen the removal proceedings, which may stay his/her removal pending final disposition ...." Buquer , 2013 WL 1332158, at *2.
II. The Stipulated Judgment Does Not Require Marion County to Violate State Law
Despite its willingness to enter into the Stipulated Judgment,[6] Marion County worries this agreement would prohibit it from doing what Indiana law requires it to do, namely, "to cooperate with federal immigration officials." Defs.' Resp. Br. Supp. Stip. J. (Dkt. 46) 2. For this proposition Marion County cites Indiana Code §§ 5-2-18.2-3 to 6. Marion County does not elaborate on its concerns, and neither Lopez-Aguilar nor the United States acknowledges this potentially dispositive issue. To resolve these concerns, we examined the applicable statutes as relevant here to determine whether they conflict with or otherwise prohibit the Stipulated Judgment.
A. Section 3 Does Not Conflict With the Stipulated Judgment
Section 3, Ind. Code ch. 5-2-18.2, prohibits a governmental body, such as the Marion County Sheriff's Department,[7] from implementing a policy that "prohibits or in any way restricts" law enforcement officers from "taking [covered] actions with regard to information of the citizenship or immigration status" of a person. Id. Covered actions include "[c]ommunicating or cooperating with federal officials." Id. § (1). Thus, Marion County's duties under Section 3 do not conflict with its duties under the Stipulated Judgment because the Stipulated Judgment prohibits Marion County only from "seizing" and "detaining" certain persons, Stip. J. 4, not from communicating with or about them.
B. Sections 5 & 6 Do Not Conflict With the Stipulated Judgment
Section 5, Ind. Code ch. 5-2-18.2, creates a private right of action for violations of Chapter 18.2. Id. It does not regulate Marion County's conduct and therefore does not conflict with the Stipulated Judgment. Section 6, Ind. Code ch. 5-2-18.2, requires a state court that finds a knowing *972 or intentional violation of Chapter 18.2 to enjoin the violation. Id. Like Section 5, Section 6 imposes no duties on Marion County and therefore does not conflict with the Stipulated Judgment.
C. Section 4 Does Not Conflict With the Stipulated Judgment
Section 4, Ind. Code ch. 5-2-18.2, prohibits a governmental body from "limit[ing] or restrict[ing] the enforcement of federal immigration laws to less than the full extent permitted by federal law." Id. Section 4 as written is far from pellucid and it has never been interpreted by any state or federal court. Specifically, it is not clear regarding whose enforcement of "federal immigrations laws" is encompassed here, id. , however those federal immigration laws are defined, nor is it clear what is meant by "limit[ing] or restrict[ing]" activities by a governmental body. Finally, it is far from clear what "the full extent permitted by federal law" means. Id.
If Section 4 is construed to mean that state governmental bodies may not limit or restrict federal enforcement of federal immigration law, Section 4 would not conflict with the Stipulated Judgment, as no part of the Stipulated Judgment purports actually or constructively to restrain federal officials from the performance of their duties. If, by contrast, Section 4 means that state governmental bodies may not limit or restrict state enforcement of federal immigration law, then the "full extent" of federal permission to do so requires delineation. Id.
Plainly, federal immigration law does not permit, and Section 4 therefore does not require, every law enforcement officer employed by a state governmental body to engage in the enforcement of federal immigration law on the same terms and basis as federal officials, free from any restriction by the governmental body (even, presumably, as to enforcement priorities). Arizona v. United States , 567 U.S. 387, 408, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) (state may not "achieve its own immigration policy" by unilateral enforcement of federal law); Buquer v. City of Indianapolis , No. 1:11-cv-708, 2013 WL 1332158, at *8-9 (S.D. Ind. Mar. 28, 2013). Clearly federal law does not go so far, and there is no indication that the Indiana General Assembly intended to go farther.
If, on the other hand, Section 4 prohibits a state governmental body from requiring or permitting anything less than state cooperation[8] with federal immigration enforcement to the full extent such state-federal cooperation is permitted by federal law, Section 4 would still not conflict with the Stipulated Judgment, because federal law authorizes only such cooperation as the Stipulated Judgment prohibits in a few, limited circumstances not relevant here. We elaborate more fully on these conclusions below.
1. Section 4 Does Not Require Marion County's Cooperation Under the INA
"[T]he system Congress created ... specifies limited circumstances in which state officers may perform the functions of *973 an immigration officer." Arizona , 567 U.S. at 408, 132 S.Ct. 2492 ; Buquer , 2013 WL 1332158, at *9 ("[C]ircumstances [in which state enforcement officers may be authorized to assist the federal government in immigration matters] are limited and clearly defined under federal law."). The "principal example" of permissible cooperation identified in Arizona is a formal, written, so-called "287(g) agreement" as provided for by the INA. Arizona , 567 U.S. at 408, 132 S.Ct. 2492 ; see 8 U.S.C. § 1357(g)(1) to (2) ; Buquer , 2013 WL 1332158, at *2.[9] Under such an agreement, a state officer is "subject to the Attorney General's direction and supervision[,]" Arizona , 567 U.S. at 409, 132 S.Ct. 2492 (citing 8 U.S.C. § 1357(g)(3) ),[10] receives training in the "significant complexities involved in enforcing federal immigration law," id. (citing 8 U.S.C. § 1357(g)(2), 8 C.F.R. §§ 287.5(c), 287.1(g) ), and requires written certification that adequate training has been completed. Id. (citing 8 U.S.C. § 1357(g)(2) ).
The Arizona Court noted other examples of permissible cooperation as defined by the terms of the INA: authorization by the Attorney General in response to an actual or imminent "mass influx of aliens arriving off the coast of the United States," id. at 408-09, 132 S.Ct. 2492 (quoting 8 U.S.C. § 1103(a)(10) ); arrest "in [the] specific circumstance" of a noncitizen who has been convicted of a felony, deported, and returned, only "after consultation with the Federal Government," id. at 409, 132 S.Ct. 2492 (citing 8 U.S.C. § 1252c ); and authorization "to arrest for [the federal crime of] bringing in and harboring certain aliens[.]" Id. at 409, 132 S.Ct. 2492 (citing 8 U.S.C. § 1324(c) ).
The INA provides that a formal, written 287(g) agreement is not required for any state officer "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B), cited in Arizona , 567 U.S. at 410, 132 S.Ct. 2492. The Arizona Court therefore also considered what would constitute permissible cooperation under this provision: "situations where States participate in a joint task force with federal officers, provide operational support in executing a warrant, or allow federal immigration officials to gain access to detainees held in state facilities." Arizona , 567 U.S. at 410, 132 S.Ct. 2492. Of critical importance to our analysis, the Court cited only the detainer statute, but not the detainer regulation , as a further example of permissible cooperation, marking a clear line between communication authorized by statute and detention not authorized by statute. Id. ("State officials can also assist the Federal Government by responding to requests for information about when an alien will be released from their custody. See [ 8 U.S.C.] § 1357(d).").
In this light, we conclude that the full extent of federal permission for state-federal cooperation in immigration enforcement does not embrace detention of a person based solely on either a removal order or an ICE detainer. Such detention exceeds the "limited circumstances" in which state officers may enforce federal immigration law and thus violates "the system *974 Congress created." Arizona , 567 U.S. at 408, 132 S.Ct. 2492.
We begin this part of our analysis by noting that a removal order, standing alone, does not solicit the state's cooperation, does not subject state officers to federal supervision and direction, does not require state officers to be trained and certified in the enforcement of immigration law, and so cannot be enforced by state officers. See Buquer , 2013 WL 1332158, at *8. Indeed, a removal order, standing alone, is not self-executing even with respect to federal officials; a removal warrant must still issue, see 8 C.F.R. 241.2(a)(1), cited in Arizona , 567 U.S. at 407, 132 S.Ct. 2492, execution of which by state officers is not authorized by federal law, see 8 C.F.R. §§ 241.2(b), 287.5(e)(3) ; even a final removal order does not necessarily subject its target to detention. See Buquer , 2013 WL 1332158, at *2 (noting circumstances under which target of removal order may be left at liberty, both before and after order becomes final). States do not enjoy federal permission to "achieve [their] own immigration polic[ies]" by deciding for themselves the consequences of a removal order. Arizona , 567 U.S. at 408, 132 S.Ct. 2492.
Further, while an ICE detainer issued under the detainer regulation, standing alone, does invite state cooperation, it does not subject state officers to federal supervision or federal direction in the execution of the detainer, that is, in the detention of its target, and does not require of the state officers executing it the training or certification required under federal law of state officers performing the functions of an immigration officer. See id. at 408-09, 132 S.Ct. 2492. Indeed, a detainer may not permissibly direct the state to do anything at all without offending the anticommandeering principles embodied in the Tenth Amendment. Galarza v. Szalczyk , 745 F.3d 634, 636 (3d Cir. 2014) ("[I]mmigration detainers do not and cannot compel a state or local law enforcement agency to detain suspected aliens subject to removal."). "[I]t would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." Arizona , 567 U.S. at 413, 132 S.Ct. 2492. Moreover, the negative implication invited by the Arizona majority opinion is difficult to avoid: the detainer statute, but not the detainer regulation, establishes a permissible form of state-federal cooperation in immigration enforcement. See id. at 410, 132 S.Ct. 2492 (approving detainer statute as permissible cooperation; omitting detainer regulation).
We find instructive the recent decision in a closely analogous case, City of El Cenizo v. Texas , 264 F.Supp.3d 744, 2017 WL 3763098 (W.D. Tex. 2017) (on motion for preliminary injunction), stayed in part pending appeal , 2017 WL 4250186 (5th Cir. Sept. 25, 2017). There, the court considered whether the INA likely preempts a provision of Texas law prohibiting local governmental units from "prohibit[ing] or materially limit[ing]" a law enforcement officer from "assisting or cooperating with a federal immigration officer as reasonable or necessary, including providing enforcement assistance[.]" Tex. Gov't Code Ann. § 752.053(b)(3), quoted in El Cenizo , 264 F.Supp.3d at 766, 2017 WL 3763098, at *9. The court ruled that this cooperation requirement likely was field- and conflict-preempted by the INA. El Cenizo , 264 F.Supp.3d at 766, 771, 2017 WL 3763098, at *12 (field preemption), *13 (conflict preemption).
Notably, as to conflict preemption, the Texas federal district court was "not persuaded" by the argument that "Congress's decision to encourage voluntary local cooperation could not have preempted State-enacted *975 policies regulating-or even requiring-local cooperation[ ]" because, as Arizona teaches, a state "cannot-through state law-expand the 'limited circumstances' in which local enforcement officials may perform the functions of immigration officers." El Cenizo , 264 F.Supp.3d at 774, 2017 WL 3763098, at *14 (quoting Arizona , 567 U.S. at 408, 132 S.Ct. 2492 ). Nor was the court persuaded that 8 U.S.C. § 1357(g)(10)(B) authorizes free-floating state-local cooperation by a "separate grant" of authority to the states without tending to nullify the requirement of federal "training, certification, and supervision" otherwise established by Section 1357(g). El Cenizo , 264 F.Supp.3d at 775, 2017 WL 3763098, at *15.
For these reasons, we conclude that the full extent of federal permission for state-federal cooperation in immigration enforcement under the INA does not permit a state to comply with removal orders, standing alone, or ICE detainers, standing alone.[11]
2. Section 4 Does Not Require Marion County's Cooperation Under the Fourth Amendment
The full extent of federal permission for state-federal cooperation in immigration enforcement imposes a second, independent limit on any requirement in Section 4 that state officers conduct seizures based solely on removal orders or ICE detainers: the Fourth Amendment. Buquer , 2013 WL 1332158, at *10. To Buquer's holding we add one clarification, which our decision in that case did not necessitate, but which the United States's participation makes appropriate here: seizures conducted solely on the basis of known or suspected civil immigration violations violate the Fourth Amendment when conducted under color of state law. Santos v. Frederick Cnty. Bd. of Comm'rs , 725 F.3d 451, 464-68 (4th Cir. 2013) ; Melendres v. Arpaio , 695 F.3d 990, 1001 (9th Cir. 2012) ; compare 8 U.S.C. 1357(g)(8) (state officer "acting under color of authority under this subsection" acts "under color of Federal authority").[12] Bedrock Fourth Amendment principles dictate this result.
The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures[.]" U.S. Const. amend. IV. Under the Amendment, the predicate for an arrest is probable cause to believe the arrestee is committing or has committed a crime. Devenpeck v. Alford , 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) ; Brown v. Texas , 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ;
*976 Dunaway v. New York , 442 U.S. 200, 212-13, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). A brief investigatory stop, short of full arrest, may be made on reasonable suspicion, short of probable cause, that criminality is afoot. Arizona v. Johnson , 555 U.S. 323, 326, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009) ; Terry v. Ohio , 392 U.S. 1, 27, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States[,] [i]f the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." Arizona , 567 U.S. at 407, 132 S.Ct. 2492 (citation omitted).
It is incontestable, though ICE has recently essayed to contest it, see Morales v. Chadbourne , 793 F.3d 208, 217 (1st Cir. 2015) (noting recently abandoned practice of ICE and predecessor INS conceding that probable cause required for issuance of detainers), that any arrest, whether for a criminal violation or for a civil immigration violation, must be supported by probable cause. Id. at 216 (citing United States v. Brignoni-Ponce , 422 U.S. 873, 878, 881-82, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ); accord Garcia v. Speldrich , No. 13-CV-3182, 2014 WL 3864493, at *7 (D. Minn. Aug. 6, 2014) ; Miranda-Olivares v. Clackamas County , No. 3:12-cv-2317, 2014 WL 1414305, at *11 (D. Or. Apr. 11, 2014). It is therefore incontestable that any arrest under an ICE detainer issued on something less than probable cause violates the Fourth Amendment.
But even in cases where ICE has or supplies probable cause to believe a noncitizen is deportable for a civil immigration violation, such probable cause, without more, does not justify the seizure of a person under color of state law. In general, civil matters do not justify arrests or custodial seizures amounting to arrests. Doe v. Metro. Police Dep't , 445 F.3d 460, 469 (D.C. Cir. 2006) ("Because the four Jane Does were arrested for a civil offense, their claims state a cause of action under the Fourth Amendment."); 4 William Blackstone, Commentaries *289 ("[A]n arrest ... is the apprehending or restraining of one's person, in order to be forthcoming to answer an alleged or suspected crime. ... [N]o man is to be arrested unless charged with such a crime as will at least justify holding him to bail when taken."). Two exceptions to this general rule are seizures under writs of bodily attachment or bench warrants for civil contempt of court, see Armstrong v. Squadrito , 152 F.3d 564, 567, 569-570 (7th Cir. 1998) (citing predecessor Ind. Code ch. 34-47-4), and seizures to effect involuntary commitments, or "mental-health seizures," in accordance with "the governing [state statutory] legal standard." Bruce v. Guernsey , 777 F.3d 872, 875-76 (7th Cir. 2015) (quotations omitted).
History and the balance of public and private interests define reasonableness within the meaning of the Fourth Amendment. Wyoming v. Houghton , 526 U.S. 295, 299-300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). The state's interest in making criminal arrests is "ensur[ing] a suspect's appearance at trial, prevent[ing] him from continuing his offense, and enabl[ing] officers to investigate the incident more thoroughly." Virginia v. Moore , 553 U.S. 164, 173-74, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008). The state's interests in making the two types of permitted civil seizures noted above similarly lie at the heart of its reserved police power: ensuring compliance with, and the functioning of, its courts, in the case of civil contempt seizures; and protecting a person from harming himself or others, in the case of mental-health seizures. See Bruce , 777 F.3d at 876 ("Generally speaking, a mental-health seizure is lawful if there is probable cause to believe *977 that the person seized is a danger to herself or others.").
In the case of seizures for civil immigration violations, by contrast, the state has no legitimate interest in effecting the seizure itself.[13] Arizona , 567 U.S. at 409-410, 132 S.Ct. 2492 (quoting Truax v. Raich , 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915) ("The authority to control immigration-to admit or exclude aliens-is vested solely in the Federal government."); rejecting dissenter's argument, 567 U.S. at 417, 132 S.Ct. 2492 (Scalia, J., concurring in part and dissenting in part), that, "[a]s a sovereign, Arizona has the inherent power to exclude persons from its territory[.]"). The state has no interest in ensuring the "suspect's" appearance at "trial," because the state may not adjudicate deportability; no interest in preventing the noncitizen from continuing his offense, because the state may not deport him; and no interest in investigating the incident, because evidence from such investigation will relate only to an adjudication the state may not conduct of the suitability of a remedy the state may not order.
Where history is silent or equivocal,[14] the balance of interests weighing so decisively in favor of individual privacy requires that this kind of unauthorized seizure of persons be disapproved. Only when acting under color of federal authority, that is, as directed, supervised, trained, certified, and authorized by the federal government, may state officers effect constitutionally reasonable seizures for civil immigration violations. As noted above, detainers, standing alone, do not supply the necessary direction and supervision.
Following Arizona , two federal courts of appeals have reached the same ultimate conclusion. In Melendres v. Arpaio , plaintiffs challenged a county sheriff's department's program of immigration enforcement on inter alia Fourth Amendment grounds. 695 F.3d at 994-95 (affirming grant of preliminary injunction). A Ninth Circuit panel held that plaintiffs were "likely to succeed on their claim that without more, the Fourth Amendment does not permit a stop or detention based solely on unlawful presence." Id. at 1000.
That court noted that, although defendant sheriff's department "previously had *978 authority ... to enforce civil immigration law" under a 287(g) agreement, that agreement had been rescinded in relevant part. Id. at 1000-01. In the absence of 287(g) authority, the court held, the sheriff's department "must enforce only immigration-related laws that are criminal in nature[.]" Id. at 1001. State officers are simply "not empowered to enforce civil immigration violations[,]" and their attempts to do so are constitutionally unreasonable. Id. ; Melendres v. Arpaio , 989 F.Supp.2d 822, 895 (D. Ariz. 2013) (granting permanent injunction) ("[W]hen [a sheriff's deputy] detains a vehicle's occupant(s) because [the] deputy believes that the occupants are not legally present in the country, but has no probable cause to detain them for any other reason, the deputy violates the Fourth Amendment rights of the occupants.").
In Santos v. Frederick County Board of Commissioners , plaintiff challenged her seizure by two sheriff's deputies after the deputies were informed by ICE of an outstanding warrant "for [plaintiff's] 'immediate deportation.' " 725 F.3d at 458. A Fourth Circuit panel reversed the district court's grant of summary judgment in defendants' favor on plaintiff's municipal liability claim because "knowledge that an individual has committed a civil immigration violation does not constitute reasonable suspicion or probable cause of a criminal infraction," and therefore cannot justify a Fourth Amendment seizure. Id. at 470.
That court noted that an ICE detainer was issued for plaintiff only after the Fourth Amendment violation had been completed, id. at 466, and restricted its holding to the proposition that, "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected violations of federal immigration law." Id. at 465. But the court observed several times the general lack of state authority over civil immigration violations. Id. at 459, 464. And its allusions to the discussion in Arizona of the certification and authorization of state officers to perform federal immigration functions by 287(g) agreements under 8 U.S.C. § 1357(g) and related provisions of the INA, id. at 463-64, 465-66, signal clearly the court's unwillingness, adopted by other lower courts as noted above, to accept that anything less than formal extension of federal authority under the system Congress created will authorize state enforcement of civil immigration violations.
For these reasons, as we concluded in Buquer and reaffirm here, seizures conducted solely on the basis of known or suspected civil immigration violations violate the Fourth Amendment when conducted under color of state law. Accordingly, federal permission to cooperate in federal immigration enforcement does not permit a state to require its law enforcement officers to comply with removal orders, standing alone, or ICE detainers, standing alone.
The full extent of federal permission extended to the states to cooperate in federal immigration enforcement, as delineated by the INA and the Fourth Amendment, does not permit a state to require its law enforcement officers to comply with removal orders, standing alone, or ICE detainers, standing alone. Accordingly, even if Section 4 requires state cooperation to the full extent permitted by federal law-and, as noted above, we are not persuaded by its terms that it does-Section 4 does not require Marion County's cooperation with removal orders, standing alone, or ICE detainers, standing alone. Stated otherwise, Section 4 does not require Marion County's cooperation with removal orders, *979 standing alone, or ICE detainers, standing alone, for three reasons: (1) the text of the statute does not require any cooperation; (2) the INA does not permit such cooperation as the Stipulated Judgment would prohibit; and (3) the Fourth Amendment does not permit such cooperation as the Stipulated Judgment would prohibit. We therefore dispense with the inquiry into whether the Stipulated Judgment is necessary to remedy a probable violation of federal law, and proceed to evaluate whether the Stipulated Judgment is fair, reasonable, and complies with Local No. 93 .
III. The Stipulated Judgment is Fair, Reasonable, and Complies With Local No. 93
A. Local No. 93 is Satisfied
A consent decree must "(1) spring from and serve to resolve a dispute within the court's subject matter jurisdiction; (2) come within the general scope of the case made by the pleadings; and (3) further the objectives of the law upon which the complaint was based." Komyatti v. Bayh , 96 F.3d 955, 960 (7th Cir. 1996) (quotations and alterations omitted) (quoting Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland , 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) ).
Applying the above requirements to this case, (1) Lopez-Aguilar's action under 42 U.S.C. § 1983 falls within the Court's subject-matter jurisdiction. 28 U.S.C. § 1331. The Stipulated Judgment will thus serve to resolve the dispute arising from Lopez-Aguilar's complaint by terminating this litigation. (2) Lopez-Aguilar's complaint alleges that he was unconstitutionally seized and detained by Marion County on the basis of formal or informal state-federal cooperation in the enforcement of federal immigration law. A remedy restricting Marion County's capacity to cooperate with ICE in the enforcement of immigration law thus comes within the general scope of the case made by Lopez-Aguilar's complaint. (3) The Stipulated Judgment will further Fourth Amendment values by limiting profound state intrusions on individual privacy where the state's interest in the intrusion is de minimis .
A consent decree may impose obligations "beyond those imposed directly by the Constitution itself[,]" so long as they are "related to the elimination of the condition that is alleged to offend the Constitution." Komyatti , 96 F.3d at 959 (citing Rufo v. Inmates of Suffolk Cnty. Jail , 502 U.S. 367, 389, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) ). While the Fourth Amendment holding in Buquer indicates that the remedy provided for by the Stipulated Judgment is imposed directly by the Fourth Amendment, to the extent the remedy in the Stipulated Judgment exceeds the Fourth Amendment's requirements, we hold that it is directly related to the elimination of the condition alleged to offend the Fourth Amendment: arrests for civil immigration violations unenforceable by the state.
B. The Stipulated Judgment Is Fair and Reasonable
We begin from the federal policy favoring settlement. United States v. George A. Whiting Paper Co. , 644 F.3d 368, 372 (7th Cir. 2011). From here, we examine whether the Stipulated Judgment is fair, reasonable, and adequate. E.E.O.C. v. Hiram Walker & Sons, Inc. , 768 F.2d 884, 889 (7th Cir. 1985). We should consider
a comparison of the strengths of plaintiffs' case versus the amount of the settlement offer; the likely complexity, length, and expense of the litigation; the amount of opposition to the settlement among affected parties; the opinion of *980 competent counsel; and, the stage of the proceedings and the amount of discovery already undertaken at the time of the settlement.
Id. at 889.
Lopez-Aguilar appears to have a strong case,[15] but its strength is proportional to the comprehensive settlement into which Marion County is willing to enter. Though Lopez-Aguilar renounces his claims to damages for himself and fees for his lawyers, Marion County will refrain from subjecting him and others to the same treatment which generated those claims to begin with. Given the contested legal nature of Marion County's qualified immunity defense, and the contested factual nature of Lopez-Aguilar's seizure and detention following his court hearing, litigating the merits of Lopez-Aguilar's case would likely involve an appeal of the qualified immunity issue, at least, as well as ultimate resolution by the trier of fact. Coming at an early stage of litigation, the parties' sunk costs are low, increasing the efficacy of the settlement.
Under the rubric of opposition to settlement from affected parties, id. , we consider the position of the United States, though, as Lopez-Aguilar notes, this is somewhat inapposite.[16] The government fails entirely to acknowledge the question on which our approval of the Stipulated Judgment must largely turn: whether Indiana requires Marion County's cooperation with immigration detainers and removal orders. The government does not acknowledge that, if Indiana law does not conflict with the Stipulated Judgment, then Marion County and Lopez-Aguilar are free to contract for nearly any remedy they desire. Opposing the Stipulated Judgment as proposed without standing under City of Los Angeles v. Lyons , 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), misconceives the posture of this case and the nature of consent decrees. See Rufo , 502 U.S. at 389, 112 S.Ct. 748.
*981 The federal government has established beyond cavil that it would prefer Marion County's continued cooperation with its immigration detainers. It gives no or at least very little weight to the equally obvious fact that Marion County would prefer to cease its cooperation with the government's immigration detainers. As indicated in our discussion above, and as Marion County observes, when civil immigration arrests are conducted under color of state law, the burdens of that cooperation, including the housing of such arrestees, not to mention any resulting litigation and ultimate liability, will fall on Marion County, not on the federal government. Defs.' Resp. Br. 3 ("Marion County's experience in this litigation confirms that local jurisdictions will be left to fend for themselves when cooperation gets them sued."). The government's preference for Marion County's cooperation does not rise to the "plain legal prejudice" required to establish standing as a nonparty objector to a settlement, Agretti v. ANR Freight Sys., Inc. , 982 F.2d 242, 246 (7th Cir. 1992), and the government never argues (or acknowledges that it should argue) otherwise.
We must also consider "whether the decree adequately protects and is consistent with the public interest[,]" United States v. Wis. Elec. Power Co. , 522 F.Supp.2d 1107, 1111 (E.D. Wis. 2007) (citing United States v. Seymour Recycling Corp. , 554 F.Supp. 1334, 1337 (S.D. Ind. 1982) ), and the judicial manageability of the remedies sought. N.L.R.B. v. Brooke Indus. Inc. , 867 F.2d 434, 435-36 (7th Cir. 1989) (Posner, J., in chambers). As to the public interest, we may not, of course, and do not, evaluate the wisdom of detainers as a matter of public policy, and thus our examination of the public interest in detainer compliance or noncompliance, outside the public interest in the protection of constitutional rights, is necessarily limited. We observe only that clear lines demarcating which sovereign is enforcing which laws and to what purpose greatly aids political accountability and democratic decision-making. See David Alan Sklanksy, Crime, Immigration, and Ad Hoc Instrumentalism , 15 New Crim. L. Rev. 157, 161, 201-02, 213-15 (2012). As to judicial manageability of the remedy, the language of the Stipulated Judgment is clear, and we see no grounds to anticipate that complex judicial management will be required to enforce its terms.
Conclusion
For the above reasons, we conclude that the Stipulated Judgment warrants judicial approval, which the Court hereby GRANTS. The Stipulated Judgment shall be entered as a final judgment by separate document. Fed. R. Civ. P. 58(a).
IT IS SO ORDERED.

The United States filed its Statement of Interest under 28 U.S.C. § 517. The Statement of Interest is entitled to our consideration and "respect," Abelesz v. Erste Group Bank AG , 695 F.3d 655, 664 (7th Cir. 2012), particularly to the extent it touches on an area of core executive competence, see, e.g., id. , but not to any "special deference." Republic of Austria v. Altmann , 541 U.S. 677, 701, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). Because the Statement of Interest by turns ignores or misconstrues the posture of this case, we have not found it to be particularly helpful or persuasive.

Marion County's answer pleads no additional relevant facts. See Dkt. 12.

Lopez-Aguilar furiously assails this attachment, arguing that "[t]he United States's use of a Statement of Interest to attempt to litigate the underlying facts of this dispute is inappropriate and is not well-taken," Pl.'s Resp. Br. Supp. Stip. J. (Dkt. 47) 4 n.2, and asks us to strike it, id. , pointing to United States ex rel. Jones v. Franzen , 676 F.2d 261, 266 n.7 (7th Cir. 1982) (criticizing as "improper" an amicus brief's inclusion of "numerous statements of fact not supported in an unchallenged record"). Lopez-Aguilar argues further that the government has forfeited the chance to offer its own facts after "refus[ing] to make itself available for discovery," Pl.'s Resp. Br. 4 n.2, pointing to Marion County's September 29, 2016, request to ICE for specified "information about the request by ICE to detain" Lopez-Aguilar, Dkt. 47 Ex. 1, at 2, and ICE's January 9, 2017, response averring that "ICE remains unable to provide the information" requested by Marion County because involving "a matter to which ICE is not a party," "information that is law enforcement sensitive," and involving "no public interest ...." Dkt. 47 Ex. 2, at 2. We decline to strike the attachment, however, as it is helpful to our analysis of the issues before us and to a correct disposition of the Stipulated Judgment.

The parties refer to a "stipulated judgment." There is no apparent distinction between a "stipulated judgment," on the one hand, and what is called a "consent decree" or a "consent judgment," on the other. Anita's N.M. Style Mex. Food, Inc. v. Anita's Mex. Foods Corp. , 201 F.3d 314, 319 (4th Cir. 2000) ("Because a stipulated judgment is analogous to a consent order or decree," it is interpreted the same way.); United States ex rel. Tri-City Elec. Co. of Iowa v. Alacran/O & SJV, L.L.C. , No. 4:11-cv-4109, 2014 WL 5473138 (C.D. Ill. Oct. 29, 2014) ("[T]he terms ["consent decree" and "consent judgment"] appear to be used by courts interchangeably, and [are] occasionally, confusingly, termed a stipulated judgment."). This Order refers generally to "consent decrees" and specifically to "the Stipulated Judgment."

When immigration enforcement was entrusted to the newly created Department of Homeland Security (DHS) in 2002, Pub. L. No. 107-296, 116 Stat. 2135, not every statutory and regulatory reference to the "Attorney General" was replaced by a reference to "DHS." But the INA clearly sets out which functions are performed by the Attorney General and which by DHS. 8 U.S.C. § 1103. Thus, references to the Attorney General in the enforcement context should be understood to refer to DHS. Similarly, references to the now-defunct Immigration and Naturalization Service (INS or "Service") should be understood to refer to its successor, ICE.

As noted above, the Stipulated Judgment would permanently enjoin Marion County "from seizing or detaining any person based solely on detention requests from ICE (in whatever form) or removal orders from an immigration court unless ICE supplies a warrant signed by a judge or otherwise supplies probable cause that the individual identified in the detainer has committed a criminal offense." Stip. J. 2.

For the statutory definitional chain, see, in order, Ind. Code §§ 5-2-18.2-1 ("governmental body" defined by crossreference), 5-22-2-13 ("governmental body" defined as "political subdivision"), 5-22-2-22 ("political subdivision" defined by crossreference), 36-1-2-13 ("political subdivision" defined as "municipal corporation"), 36-1-2-10 ("municipal corporation" defined as "separate local governmental entity that may sue and be sued").

This is a strained reading of the statute, which nowhere even mentions cooperation. If the Indiana General Assembly specifically intended to mandate state cooperation with federal authorities, it surely could have said so:
A governmental body ... may not ... implement ... a policy that prohibits or in any way restricts ... a law enforcement officer, a state or local official, or a state or local government employee ... from taking the following actions with regard to information of the citizenship or immigration status ... of an individual: (1) Communicating or cooperating with federal officials.
Ind. Code § 5-2-18.2-3 (emphasis added).

As Buquer noted, "Indiana has no such agreement with the federal government." 2013 WL 1332158, at *2.

Indeed, such direction and supervision are required whenever a state officer "perform[s] a[n immigration officer] function under this subsection[.]" 8 U.S.C. § 1357(g)(3) ; accord Santos v. Frederick Cnty. Bd. of Comm'rs , 725 F.3d 451, 464 (4th Cir. 2013).

A different result would likely obtain if such enforcement cooperation as contemplated by Section 4 occurred only in the "limited circumstances" discussed in Arizona . 567 U.S. at 408, 132 S.Ct. 2492. But the Stipulated Judgment refers to detentions "based solely" on detainers or removal orders. Stip. J. 4. If cooperative state enforcement of detainers or removal orders arose in the limited circumstances approved in Arizona , such enforcement would not be "based solely" on the detainers or removal orders themselves. Id.

In Buquer , as here, we had no occasion to opine on the constitutional status of immigration seizures conducted by the federal government, though the constitutional consequences for federal immigration enforcement of the Supreme Court's rejection of the plenary power doctrine, I.N.S. v. Chadha , 462 U.S. 919, 941, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), still await full judicial review. See Abel v. United States , 362 U.S. 217, 230, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (preceding by seven years Camara v. Mun. Court , 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) ; declining Fourth Amendment challenge to administrative deportation warrant because waived below; offering "sanction of time" as justification for "administrative arrest to achieve detention pending deportation").

We do not deny that immigration law implicates a host of legitimate state interests. Arizona , 567 U.S. at 397-98, 132 S.Ct. 2492 (noting state's interests in crime, public health and safety, property damage, and environmental damage all implicated by immigration). But, as Arizona teaches, the state has no legitimate interest in the basic issues of immigration law, to wit: who may stay in this country and who may not. See id. at 409-10, 132 S.Ct. 2492.

The founding-era "common law" of seizure, as explored in Atwater v. City of Lago Vista , 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), and to a lesser degree in Moore , addressed only arrest for crimes. See Atwater , 532 U.S. at 326-345, 121 S.Ct. 1536 (considering whether only misdemeanors causing breach of peace authorized warrantless arrest at founding); see generally 1 William Blackstone, Commentaries *365-375 (noting differences between rights of aliens and others, omitting greater liability of alien to seizure).
The closest founding-era analogue for holding noncitizens liable to immediate and warrantless arrest, detention, and deportation is the Alien Enemies Act, 1 Stat. 577, 50 U.S.C. § 21, the only still-surviving component of the widely condemned Alien and Sedition Acts of 1798, which authorized such treatment only as to noncitizens who were subjects or citizens of a nation between which and the United States war had been declared or had actually begun. See Johnson v. Eisentrager , 339 U.S. 763, 772-74, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). The constitutionality of the Alien Enemies Act, unlike its sister acts, was not seriously questioned, apparently because understood to be predicated on the Congressional war-making power. See id. at 773 n.6, 70 S.Ct. 936.

From the face of the parties' and the government's submissions, it appears that Lopez-Aguilar was taken into custody on less than even reasonable suspicion of a civil immigration violation. No matter whether Lopez-Aguilar was seized by Davis within the meaning of the Fourth Amendment after his hearing in Marion Superior Court, he was clearly seized before the hearing "[i]mmediately" on his arrival at the courthouse when Davis took him into custody and "placed [him] in a locked, secure prisoner holding area[,]" Pl.'s Compl. ¶ 15, for up to two hours. See Rodriguez Aff. ¶ 8. And, no matter whether Davis's prehearing seizure of Lopez-Aguilar was prompted by a formal detainer, by an "informal" detainer or detention request, or simply by Wies's expressed interest in speaking with Lopez-Aguilar, not even by Wies's (unsolicited) affidavit does ICE claim to have had probable cause to believe Lopez-Aguilar was deportable; Wies simply wanted "to determine if any action should be taken." Wies Aff. ¶ 3.
As a justification for a Fourth Amendment seizure, this is indistinguishable from ICE detainers communicating only that a deportability investigation has begun, see Miranda-Olivares v. Clackamas County , No. 3:12-cv-2317, 2014 WL 1414305, at *1 (D. Or. Apr. 11, 2014), which are invariably found insufficient to justify Fourth Amendment seizures. Id. at *11 ; see also Arizona v. United States , 567 U.S. 387, 407, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012) ("Detaining individuals solely to verify their immigration status would raise constitutional concerns.").

The government alleges itself to be a "party in interest" to this litigation. Stmt. Int. Opp. Stip. J. (Dkt. 42) 52. It is not, as the government's own conduct bears out. The government alludes to its right of intervention where "the constitutionality of any Act of Congress affecting the public interest is drawn into question," 28 U.S.C. § 2403, but it has not invoked that right, as indeed it could not: this suit challenges the constitutionality of no statute, Congressional or otherwise. The government tacitly acknowledged this fact by submitting its Statement of Interest under 28 U.S.C. § 517.