**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4275**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GUILLERMO SANTIAGO-FRANCISCO,

Defendant - Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg. Thomas S. Kleeh, District Judge. (1:19-cr-00012-TSK-MJA-1)

Submitted: May 22, 2020                                      Decided: July 23, 2020

Before AGEE, WYNN, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished opinion. Judge Quattlebaum wrote the majority opinion, in which Judge Agee joined. Judge Wynn wrote a dissenting opinion.

L. Richard Walker, Senior Litigator, Clarksburg, West Virginia, Kristen Leddy, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. William J. Powell, United States Attorney, Martinsburg, West Virginia, Brandon S. Flower, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

QUATTLEBAUM, Circuit Judge:

Federal and local officers in Clarksburg, West Virginia executed a *Terry* stop of a vehicle based on their suspicion that one of the passengers had illegally reentered the United States, in violation of 8 U.S.C. § 1326. During the stop, the officers encountered Guillermo Santiago-Francisco, another passenger. After patting down Santiago and the other occupants, the officers took them to the local police station. There, Santiago executed a *Miranda* waiver form, admitted lacking the necessary documentation to live and work in the United States and consented to a search of his bedroom, during which the officers discovered fraudulent identification documents. As a result, Santiago was charged with possessing fraudulent documents in violation of 18 U.S.C. § 1546(a). Santiago moved to suppress evidence of the documents by challenging the constitutionality of the initial stop. The district court denied the motion finding the officers possessed a reasonable suspicion of criminal activity sufficient to conduct a *Terry* stop. We conclude that under the facts presented in this record, the stop did not violate the Fourth Amendment. Accordingly, we affirm.

I.

In October 2018, Special Agent Christopher Robert Holmes of the Department of State Diplomatic Security Service ("DSS") and Clarksburg police began a joint investigation into Daniel Domingo Perez and Juan Carlos De Leon Zanas, Mexican

2

nationals who were persons of interest in a previous local kidnapping incident.[1] While investigating that incident, local officials came to suspect Perez and Zanas were violating federal immigration laws. Thus, they referred the immigration matters to federal officials, who, in turn, obtained an arrest warrant for Zanas.

From his investigation, Special Agent Holmes believed Perez and Zanas resided at 901 Tiano Lane in Clarksburg and worked at a local Mexican restaurant called El Rey. Holmes contacted Gary Olcott, an Enforcement and Removal Officer with Immigration and Customs Enforcement ("ICE"), to investigate possible links between the Tiano Lane address and immigrants in the ICE database. Holmes also established a surveillance platform of the Tiano Lane residence.

After searching the ICE database, Olcott found no connection between Perez or Zanas and the Tiano Lane address, but learned that there were two other individuals associated with that address who were also suspected of immigration violations. Relevant here, one of those individuals was Javier Rosario-Azamar, a previously deported Mexican national. Olcott reported this information to Holmes. Thus, based on his conversations with Olcott, Holmes believed Rosario was previously deported and currently in violation of 8 U.S.C. § 1326, under which illegal reentry into the United States is classified as a felony.

---

[1] The facts presented here are in the light most favorable to the government since it prevailed on the motion to suppress. *United States v. Lull*, 824 F.3d 109, 114–15 (4th Cir. 2016) (explaining that, when reviewing the trial court's ruling on a motion to suppress, this Court "must construe the evidence in the light most favorable to the prevailing party and give due weight to inferences drawn from those facts by resident judges and law enforcement officers" (internal quotation marks omitted)).

Holmes and Olcott also exchanged a series of emails through which they shared photographs from the ICE database and photographs Holmes took from a surveillance platform at the Tiano Lane residence. Holmes and Olcott felt some of the surveillance photographs strongly resembled Zanas and possibly resembled Perez.

The agents later met to surveil the El Rey restaurant. While doing so, they observed a man leave the restaurant two times to take out the trash. After comparing the surveillance photographs to the ICE database photographs, Holmes believed the man taking the trash out was Rosario. That evening, the agents also observed a gold Toyota Camry arrive at the restaurant, pick up several people and proceed to 901 Tiano Lane.

The next morning, Holmes returned to the Tiano Lane residence. While conducting surveillance, he saw four men leave the house and get into the Camry. Holmes "could readily identify Javier Rosario-Azamar," but did not recognize the other men. J.A. 77. Believing Rosario to be in violation of 8 U.S.C. § 1326, and having identified Rosario as one of the car's passengers, Holmes instructed local police officers to stop the Camry. Two patrol officers effectuated the stop and directed the driver and the passengers to exit the vehicle.

Neither Perez nor Zanas were in the car. But Rosario, along with Santiago and two others, were. The driver provided "a fake identification card" to the officers. J.A. 56. The officers then patted down all the occupants for weapons and, after determining that none of them had a valid driver's license, towed the vehicle to the police department for an inventory search, which yielded approximately $15,000 in cash.

Holmes and other federal agents arrived at the scene and transported all the occupants of the Camry to the Clarksburg Police Department. With respect to Santiago, the agents took his fingerprints and, after he signed a *Miranda* waiver form in Spanish, interviewed him. Santiago admitted that he did not have proper documentation to live and work in the United States and consented to the search of his bedroom at the Tiano Lane residence. During the subsequent search, federal agents found a fraudulent Lawful Permanent Resident card and Social Security card.

A federal grand jury indicted Santiago for fraud and misuse of documents, in violation of 18 U.S.C. § 1546(a). Before trial, Santiago moved to suppress the documents found at the Tiano Lane residence. He argued that the officers and agents lacked a reasonable, articulable suspicion for conducting the investigative stop because (1) there was no identified traffic infraction; and (2) the suspected illegal presence of one individual—Rosario—was not a sufficient basis for stopping the Camry and questioning all of its occupants. Santiago also argued that the officers improperly induced him to consent to the search of the Tiano Lane residence, rendering his consent involuntary. But at the motion hearing, he withdrew all arguments except his challenge to the legality of the initial stop. Specifically, he did not challenge the questioning and pat down he received during the stop, the validity of his *Miranda* waiver or his consent to the government's search of his bedroom.

At the hearing, the government called Holmes and the two Clarksburg patrol officers who conducted the traffic stop as witnesses. Neither patrol officer testified that they independently knew or suspected that one of the vehicle's occupants had engaged in

5

criminal activity that would have supported the stop. Instead, they stated that they stopped the vehicle after receiving instructions from Holmes. Holmes testified that he authorized the stop because he suspected Rosario had illegally reentered the United States. Specifically, based on information from Olcott, Holmes stated that he believed Rosario was previously deported and had unlawfully reentered the United States, in violation of 8 U.S.C. § 1326.

In response, Santiago argued that the officers lacked either reasonable suspicion or probable cause for the stop. Specifically, he maintained the government was required to investigate Rosario's immigration status before relying on a suspected violation of 8 U.S.C. § 1326 to stop a vehicle that was not being operated illegally or being used to transport other individuals suspected of criminality. He contended, because Holmes had not verified Rosario's prior deportation and did not have any information about his "actual immigration status," the prior record of Rosario's deportation was insufficient to support the stop. J.A. 149–50, Santiago further challenged Holmes' method for confirming that Rosario was the individual in the ICE database, suggesting mere photographic review was insufficient, and that more sophisticated techniques should have been employed.

The district court denied Santiago's motion to suppress. It noted that, based on the information he received from Olcott, Holmes suspected Rosario was "a Mexican national believed to have no legal status and a prior history of deportation. He was believed to have reentered the country illegally, a felony under 8 U.S.C. § 1326(a). Holmes testified that he was aware of Rosario-Azamar's criminal history prior to the traffic stop at issue." J.A. 169.

6

The district court also rejected Santiago's criticism of Holmes' identification of Rosario. On this point, the court emphasized that during the surveillance of the El Rey restaurant the day before the stop, Holmes twice got clear looks at Rosario's face. According to the district court, this, coupled with the similarities between the photographic materials, allowed Holmes to identify Rosario as one of the men entering the gold Camry departing 901 Tiano Lane. It further emphasized that Holmes noted several distinctive physical attributes—including Rosario's mustache—which aided his identification.

The district court also found that, under the collective knowledge doctrine, Holmes passed his information about Rosario's possible criminal conduct to the patrol officers, providing them with sufficient reasonable suspicion to conduct the stop.

For these reasons, the district court concluded that Holmes reasonably suspected that Rosario was "in the country illegally with a prior deportation in violation of federal law" and was in the Camry at the time of the stop. J.A. 174. It found that the agents were not required to do anything more to confirm Rosario's identity prior to the *Terry* stop.

Lastly, recognizing the general rule that the "police may conduct an investigatory stop when they have reasonable, articulable suspicion that any crime is occurring[,]" the district court determined that the agents "did not need to know beyond a reasonable doubt that it was Rosario-Azamar who exited the home on Tiano Lane and entered the Toyota Camry." J.A. 175. Instead, the court explained Holmes "had reasonable suspicion that Rosario-Azamar, someone law enforcement believed to be violating immigration laws, entered the vehicle." J.A. 175–76. It thus ruled that the *Terry* stop was permissible under

7

the Fourth Amendment and that the evidence seized during the ensuing search of the Tiano Lane residence was admissible.

Following the denial of his motion, Santiago entered a guilty plea conditioned on his ability to appeal the district court's admission of the challenged evidence. He timely appealed, and we have jurisdiction of the appeal under 28 U.S.C. § 1291.

II.

Our standard of review is well-settled. In considering the district court's denial of a motion to suppress, this Court reviews its legal conclusions de novo and its factual findings for clear error. *United States v. Kolsuz*, 890 F.3d 133, 141–42 (4th Cir. 2018).

As he did before the district court, Santiago challenges only the validity of the initial traffic stop. Santiago asserts that evidence of a prior deportation, standing alone, fails to constitute reasonable suspicion of criminal activity sufficient to support a traffic stop. In turn, he insists that allowing officers to justify an investigative stop based on a reasonable suspicion of an individual's prior deportation—without more—is unconstitutional and would run afoul of prior decisions of this Court and the Supreme Court, which prohibit police investigations and conduct based on a suspect's race, legal status and/or national origin.

Santiago also argues Holmes did not exercise sufficient diligence to uncover the details of Rosario's prior deportation, including when it occurred and whether Rosario's presence in the United States contravened 8 U.S.C. § 1326. According to Santiago, Holmes "grossly oversimplified the legal and factual matters at hand[,]" suggesting that "[a]

8

reasonable federal agent with even a rudimentary understanding of immigration law would know that a prior deportation does not, by itself, create reasonable suspicion that someone is guilty of illegal reentry by a previously removed alien because official consent to reenter is a robust and very viable possibility under the law." Appellant's Br. at 18, 21.

## III.

To address Santiago's arguments, we begin with the basics of a *Terry* stop. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court first recognized that an officer may stop and search a person without probable cause in limited circumstances. Following *Terry*, this Court has held that, consistent with the Fourth Amendment, "[a]n officer may stop and briefly detain a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *United States v. Montieth*, 662 F.3d 660, 665 (4th Cir. 2011) (quoting *United States v. Hensley*, 469 U.S. 221, 227 (1985)). To justify such an investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "Thus, a court must look to the totality of the circumstances in determining whether the officer had a particularized and objective basis for suspecting criminal activity." *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011). "While such a detention does not require probable cause, it does require something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (quoting *Terry*, 392 U.S. at 27).

9

Importantly, traffic violations are not required to justify *Terry* stops. *United States v. Hassan El*, 5 F.3d 726, 729–30 (4th Cir. 1993). Instead, *Terry* and its progeny require only that the officer has "a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *Id.* And in explaining the reasonable suspicion standard, the Supreme Court recently stated "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy[.]" *Kansas v. Glover*, 140 S. Ct. 1183, 1188 (2020) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). "[A]s we have explained, '[t]o be reasonable is not to be perfect[.]'" *Id.* (quoting *Heien v. North Carolina*, 574 U.S. 54, 60 (2014)). Under this standard, we agree that the record supports the district court's finding that the agents possessed reasonable, articulable suspicion to support the stop.

While Santiago correctly points out that we have not previously determined the degree of reasonable suspicion necessary to support a stop based on facts like those presented here, we disagree with Santiago's assertion that *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013) controls our decision. There, police officers approached Santos, a restaurant worker, while she was taking a break on the back steps. After asking Santos for her identification, the officers learned of an outstanding civil warrant for her deportation. Then, before confirming the warrant remained active, they apprehended her. *Id.* at 457–58. Santos subsequently brought a 42 U.S.C. § 1983 (2018) civil rights action, claiming a police officer's "knowledge that an individual has committed a civil immigration violation does not constitute reasonable suspicion or probable cause of a criminal infraction . . . ." *Id.* at 470. While we upheld the dismissal of the action against the defendants in their individual capacity on other grounds, we allowed the claims against

10

the defendants in their official capacity to go forward, holding a *Terry* stop requires reasonable suspicion of *criminal* activity—which a civil warrant, like the one at issue in *Santos*, could not provide. *Id*. at 460–61.

But the facts here differ from those in *Santos*. Holmes did not apprehend Rosario based on a civil warrant. Instead, he possessed reasonable suspicion, based on specific and articulable facts, of a criminal violation of 8 U.S.C. § 1326(a). Specifically, § 1326(a) criminalizes

> any alien who has been deported . . . and thereafter enters, attempts to enter, or is at any time found, in the United States unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission . . . .

8 U.S.C. § 1326(a). In turn, as the district court properly noted, Holmes' suspicion of Rosario's § 1326(a) violation was based on information from ICE Agent Olcott that Rosario was "in the country illegally with a prior deportation in violation of federal law." J.A. 174. Based on this information from ICE regarding Rosario's illegal reentry and his identification of Rosario through photos and surveillance, Holmes possessed sufficient reasonable suspicion to stop the car in which Rosario was a passenger.

Further, we find Santiago's criticism of the extent of Holmes' investigation into Rosario's immigration status unpersuasive. Holmes was not required to rule out the possibility that Santiago had legally reentered the country. *See Glover*, 140 S. Ct. at 1188 (finding reasonable suspicion where a police officer inferred that the owner of a vehicle, whose driver's license has been revoked, was driving the vehicle without ruling out the possibility someone else was driving). With no evidence from Olcott that Rosario's

11

deportation history contained any authorization for him to reenter the United States, and based on his previous identification of Rosario, Holmes possessed reasonable and articulable suspicion that the individual he had identified as Rosario was engaging in criminal activity.

We also note that our decision here is consistent with the other circuits that have addressed the issue. In *United States v. Lopez-Tubac*, 943 F.3d 1156, 1159 (8th Cir. 2019), local authorities notified an ICE agent of their arrest for driving under the influence of an alien, who they suspected might be illegally in the United States. Through his investigation, the ICE agent learned the alien had been previously deported and the vehicle he was driving was not registered to him, a tactic, according to the ICE agent, common for individuals who illegally reenter the country. *Id*. at 1159. After locating an individual who matched the alien's description, officers conducted a traffic stop based on their suspicion the alien was currently committing the crime of illegal reentry into the United States after deportation. *Id*. at 1158. In response to a challenge to the stop, the Eighth Circuit held, based on the totality of circumstances, that the stop was permissible because the officer reasonably suspected that the alien was "committing a crime—being illegally present in the United States." *Id*. at 1159.[2] The Eighth Circuit did not require the officers to confirm the alien was in the country illegally.

---

[2] *See also United States v. Spencer*, 646 F. App'x 6, 9 (2d Cir. 2016) (holding agents had sufficient reasonable suspicion of alien's criminal conduct "based on their independent review of his immigration file and immigration databases" and corroborating an anonymous tip by personally observing "a man fitting [the defendant's] description driving" the target vehicle "shortly before the stop"); *United States v. Salas-Avalos*, 459 F.

12

Finally, we agree with the district court that Holmes' identification of Rosario from a comparison of photographs and from his first-hand surveillance was sufficient. To be sure, there are more advanced and sophisticated identification tools than visual photograph comparisons. But we know of no authority, and indeed Santiago points us to none, that indicates the use of such techniques is required to justify a *Terry* stop. To reiterate what the district court properly explained, the officers needed only a reasonable suspicion of criminal activity, not proof beyond a reasonable doubt.

IV.

According to our colleague in dissent, the traffic stop is akin to, if not worse than, stopping an individual based solely on prior criminal history. We disagree. Our decision today does not conflict with the general principle that a criminal record, standing alone, is insufficient to create reasonable suspicion. Far from that, Rosario was suspected of the current crime of reentering the United States illegally after a prior deportation. Through his investigation, Holmes confirmed Rosario's prior deportation. While prior deportation is not itself a crime, it is one of the two elements of the suspected crime. As to the second element, his illegal reentry, Holmes had evidence that Rosario had reentered. All he lacked

---

App'x 318, 320 (5th Cir. 2012) (holding that law enforcement had reasonable suspicion "to detain the [target] vehicle at least long enough to identify its occupants" when the agents could link defendant's home address "with a telephone number that was used in an alien smuggling scheme," and the agents were on the lookout for a truck "believed to be used in alien smuggling," which later arrived at defendant's residence and "shortly after stopped and discharged four to six passengers").

13

was confirmation that Rosario had not legally reentered. But on that issue, Holmes testified that his suspicion that Rosario was in the country illegally arose from his communication with ICE Agent Olcott following Olcott's review of the ICE database. Although Holmes did not specifically testify that he confirmed Rosario had no legal status, it was reasonable for Holmes to infer that if Rosario was legally in the United States, such information would have been contained in the ICE database and Olcott would have indicated to Homes that Rosario was authorized to be in the United States. Requiring further investigation into whether Rosario had entered legally under this record would be tantamount to requiring officers rule out the possibility of innocence. The Supreme Court's recent *Glover* decision makes clear that is not required. Holmes had more than enough evidence to satisfy the standard that is required—that there was a reasonable suspicion of criminal activity.

V.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED*.

14

WYNN, Circuit Judge, dissenting:

The Fourth Amendment requires officers to have a reasonable suspicion that criminal activity is afoot before they stop a car.

Here, law enforcement officers in West Virginia stopped four men carpooling to work, contending that one of the men, Javier Rosario-Azamar, had violated 8 U.S.C. § 1326(a), which requires proof of two elements: a previous deportation *and* an *illegal* reentry. But the officers only knew that Rosario-Azamar had previously been deported which satisfied the first element but not the second element because simply being in the United States after a previous deportation is not a crime. In short, the officers' reasonable suspicion determination rested on the single inference that the mere presence of a previously deported person in the United States shows *illegal* reentry. That's not the law. Accordingly, I respectfully dissent.

I.

The events leading to the stop began when Diplomatic Security Service Agent Holmes and Immigration and Customs Enforcement (ICE) Officer Olcott were searching for Daniel Domingo Perez and Juan Carlos De Leon Zanas for violating immigration laws.[1] The search led the officers to a house at 901 Tiano Lane in Clarksburg, West Virginia where they suspected they could find Perez and Zanas. After running the address through

---

[1] The majority opinion notes that Perez and Zanas were "persons of interest in a previous local kidnapping incident." Majority Op. at 3. To be clear, the district court's findings of fact stressed that "Defendant [Santiago-Francisco] has not been associated with any of these [kidnapping] allegations in any way whatsoever." J.A. 168.

15

an ICE database, Olcott sent Holmes emails that contained photographs of two men staying at the house, Mateo Delunas and Javier Rosario-Azamar, and noted they had past "immigration encounters."[2] J.A. 70. Based only on this past immigration information from Olcott, with no information about Rosario-Azamar's current immigration status, Holmes believed that Rosario-Azamar illegally reentered the country, in violation of 8 U.S.C. § 1326(a). Through subsequent surveillance, the officers connected Rosario-Azamar and the others at the house to a local Mexican restaurant where they worked, and to a gold Toyota Camry that they used to carpool.

On the morning of December 12, 2018, Holmes arranged for local police to stop the Camry on its way to the restaurant. Staking out the house, Holmes identified Rosario-Azamar and saw him, along with three other men, get into the Camry to go to work. Holmes then called the local police, who were lying in wait, and they initiated the stop. At the time of the stop, the officers had not observed any traffic violations and only stopped the vehicle because Holmes instructed them to. The officers believed the stop "had something to do with illegal immigration," J.A. 46-47, and "there were illegal immigrants in the vehicle," J.A. 60. The officers told the men to get out of the car, and among them were Rosario-Azamar and Defendant Santiago-Francisco.

---

[2] The majority opinion describes Olcott as "learn[ing] that there were two other individuals associated with that address who were also suspected of immigration violations." Majority Op. at 3. The district court's findings of fact describe Olcott as sending Holmes "two names of individuals with prior immigration encounters." J.A. 169.

16

Subsequently, officers Mirandized the four men and took them to a local police station. At the station, Santiago-Francisco gave officers permission to search 901 Tiano Lane in order to bring him his immigration paperwork. During their search, the officers found a counterfeit green card and a counterfeit Social Security card. Based on those counterfeits, the Government indicted Santiago-Francisco for one count of fraud and misuse of a document, 18 U.S.C. § 1546(a). Santiago-Francisco moved to suppress the documents, challenging the legality of the traffic stop. The district court denied the motion to suppress and this appeal followed.

## II.

The Fourth Amendment allows a law enforcement officer to detain a person for a brief investigatory stop if the officer "possess[es] 'a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To have such a reasonable suspicion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Thus, when a defendant challenges a stop, "it is the *government's* burden to articulate facts sufficient to support [a] reasonable suspicion." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) (emphasis added). When a district court upholds a stop, this Court reviews the district court's factual findings for clear error and its legal conclusions—including whether the facts satisfy the constitutional standard—de novo. *United States v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003).

17

Here, the district court's findings of fact initially describe Rosario-Azamar as "believed to have no legal status" and "believed to have reentered the country illegally." J.A. 169. The district court later summarily upgrades the officers' beliefs to outright knowledge, indicating Rosario-Azamar was "known by law enforcement to be in the country illegally." J.A. 174.[3] But neither the district court, nor the Government, nor the majority here ever explain how either the officers' "belief" or their "knowledge" follow from the scant factual record, which only shows that Rosario-Azamar had previously been deported.[4] This explanation is important because the reasonable suspicion inquiry is not *whether* officers believed criminal activity was afoot, but *why*—a suspicion unsupported by "specific and articulable facts" and "*rational* inferences" is not reasonable. *Terry*, 392 U.S. at 21 (emphasis added).

---

[3] The majority opinion quotes this same sentence from the district court opinion to indicate that "the district court properly noted [that] Holmes' suspicion of Rosario's § 1326(a) violation was based on information from ICE Agent Olcott that Rosario was 'in the country illegally with a prior deportation in violation of federal law.'" Majority Op. at 11 (quoting J.A. 174). What the district court noted was: "Holmes had reasonable, articulable suspicion to believe that Rosario-Azamar, who was known by law enforcement to be in the country illegally with a prior deportation in violation of federal law, was in the Toyota Camry." J.A. 174.

[4] The majority opinion notes that the district court also found that "Holmes testified that he was aware of Rosario-Azamar's *criminal* history prior to the traffic stop." Majority Op. at 6 (quoting J.A. 169) (emphasis added). This appears to be a reference to Rosario-Azamar's deportation history. Although immigration violations and crimes are sometimes conflated, a "deportation history" is not a "criminal history" because deportation is a civil proceeding. *See Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013) ("[T]he Supreme Court has long characterized deportation as a civil proceeding."). Holmes did not testify, nor did the Government otherwise present any evidence, that Rosario-Azamar had a criminal record.

18

The Government asserts that the officers did not perform the traffic stop "merely because Rosario-Azamar had a deportation history." Response Br. at 11. Instead, the Government argues that there were "sufficient facts" to support Holmes's suspicion "that Rosario-Azamar was in violation of 8 U.S.C. § 1326(a)." *Id.* As to what those "sufficient facts" were, almost all of the Government's contentions relate to Rosario-Azamar's physical appearance and the officers' positive identification of him. *See, e.g.*, Response Br. at 13 (highlighting the "angle of [Rosario-Azamar's] mustache"). But those facts do nothing to link Rosario-Azamar to a violation of § 1326(a), and are thus irrelevant to the reasonable suspicion analysis. *See Florida v. J.L.*, 529 U.S. 266, 272 (2000) (merely identifying a determinate person provides no basis to suspect illegal conduct). Rather, to meet its burden, the Government must produce concrete facts suggesting that Rosario-Azamar violated § 1326(a).

While the Government emphasizes a litany of irrelevant points about physical identification, discussed above, the Government musters virtually nothing relevant to § 1326(a). This is doubtless because, on appeal, the record before this Court contains virtually nothing relevant to § 1326(a). At best, the record indicates Holmes made a few vague statements during the suppression hearing about a prior deportation. Specifically, Holmes testified that Olcott indicated Rosario-Azamar "had immigration encounters in the past," and a "prior immigration deportation history." J.A. 70. At another point, on re-re direct examination, Holmes explained that the information from Olcott, that is, the "immigration history," contained "[Rosario-Azamar's] photograph, and . . . a short graphic

19

that had some personal details about his immigration history." J.A. 107. Holmes then added, "[a]nd Gary Olcott and I had discussed it, that he was a previous deportee." J.A.107.

None of these facts tell us anything concrete about whether Rosario-Azamar violated § 1326(a). Nor, across all of his testimony, did Holmes ever explain what a "prior immigration deportation history" is. Nor did the Government produce any other evidence on this point.

Thus, when Holmes had local police officers stop the vehicle, he lacked any sound, articulable facts explicitly linking Rosario-Azamar to a violation of § 1326(a), and instead was armed only with the knowledge of Rosario-Azamar's prior deportation. The entire reasonable suspicion determination, therefore, rests on a single inference: that because a person was previously deported, their presence in the United States suggests that they are here improperly.[5]

But knowledge of a previous deportation alone cannot give officers reasonable suspicion that an individual has illegally reentered the country. Deportation only indicates that a person was non-compliant with immigration laws in the past. It does not bar an individual from later reentering the United States legally.[6] In fact, the very statute that the

---

[5] Tellingly, the Government summarily describes Holmes's information not as an "immigration history," but instead as a "deportation history." Response Br. at 12; *see also* Response Br. at 6 ("Holmes knew Rosario-Azamar to be in the United States illegally because of Rosario-Azamar's prior deportations."). Thus, the Government implicitly concedes Holmes did not have anything more substantial.

[6] *See* 8 U.S.C. § 1158(a)(1) ("Any alien who is physically present in the United States or who arrives in the United States[,] . . . irrespective of such alien's status, may apply for asylum in accordance with this section . . . ."); 8 U.S.C. § 1231(b)(3)(A)

20

officers suspected Rosario-Azamar was violating sets out how a person who has been deported can legally reenter the country.[7] As such, the bare fact of being deported and then found in the United States again is *entirely indistinguishable from innocent behavior*. It follows that no reasonable officer could conclude that deportation alone suggests that Rosario-Azamar was in violation of § 1326(a).

## III.

The majority attempts to sidestep the conspicuous absence of any fact other than the prior deportation (and thus the Government's failure to carry its burden) by stating that Holmes was not required to rule out the possibility that Rosario-Azamar had legally reentered the country. But the majority looks high when it should look low. An officer of

---

(explaining that the Attorney General may not remove an alien to a another country if the alien's life or freedom would be threatened on account of a protected ground there); 8 U.S.C. § 1182(d)(5)(A) ("[T]he Attorney General may . . . parole into the United States temporarily under such conditions as he may prescribe . . . any alien . . . .").

[7] 8 U.S.C. § 1326(a) provides:
> (a) In general
> Subject to subsection (b), any alien who—
> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,
>
> shall be fined under title 18, or imprisoned not more than 2 years, or both.

21

course does not need to rule out all possibility of innocence. However, that observation is irrelevant to the question of whether officers had a reasonable suspicion and therefore cleared the constitutional minimum requirement for a stop. Without investigation into Rosario-Azamar's current immigration status, the previous deportation alone provided no information regarding any ongoing wrongdoing. Therefore, Holmes's failure to further investigate Rosario-Azamar's current immigration status is of pivotal importance: without it there is no indication of criminal activity that would justify the stop.

Although the majority argues that *Santos v. Frederick County Board of Commissioners,* 725 F.3d 451 (4th Cir. 2013), does not control the outcome of this case, *Santos* speaks directly to the issue here. In *Santos*, two Maryland deputy sheriffs approached Roxana Santos while she was sitting outside her place of work, eating a morning sandwich, and asked for identification. *Id.* at 457-58. She provided the deputies with her El Salvadoran national identification card and they discovered that she had an outstanding ICE warrant for deportation. *Id.* at 458. Before receiving confirmation that the warrant was still active, and without determining whether the warrant was civil or criminal, the officers indicated to Santos that she was not free to leave, thus seizing her for the purposes of the Fourth Amendment. *Id.* at 458, 462. In that case, because the warrant turned out to be a civil warrant, and the state law enforcement officers had no authority to detain or arrest individuals based solely on a suspected civil violation of federal immigration law, we held the officers violated Santos's rights. *Id.* at 465.

Of course, as the majority points out, Holmes (a federal agent) suspected Rosario-Azamar of a criminal immigration offense (rather than the civil immigration offense at

issue in *Santos*). But that distinction is immaterial here because in *Santos* we went on to reiterate the principle that, "because law enforcement officers, not detainees, are responsible for identifying evidence justifying a seizure[,] . . . . when affirmative evidence does not justify a seizure, the seizure violates the Fourth Amendment." *Id.* at 467. Thus, we explained that even if the record had been silent as to whether the warrant was criminal or civil, the seizure would have been unconstitutional. *See id.* "[I]t was the deputies' responsibility to determine whether the warrant was for a criminal or civil immigration violation before seizing Santos." *Id.*

Ultimately, the inquiry here is the same as the inquiry in *Santos*: did the information available to the officers at the time of the stop support a specific and reasonable inference of ongoing criminal activity by Rosario-Azamar? Holmes had no indication that Rosario-Azamar was currently violating any laws. All he had was the outcome of a past civil proceeding. Just as the deputies in *Santos* failed to investigate their warrant, Holmes failed to investigate Rosario-Azamar's current status, which would have told him something about whether Rosario-Azamar was in the United States illegally. Without such investigation, there is no indication that Rosario-Azamar was committing any crime by being in the United States. Therefore, the stop here was unlawful for the same reasons as in *Santos*.

Moreover, setting aside the majority's attempt to distinguish *Santos*, the other cases the majority cites as affirmatively supporting its conclusion do not support that conclusion. Rather, examining those cases highlights the Government's failure here to identify articulable facts to justify the stop and carry its burden.

23

First, the majority erroneously concludes that *United States v. Lopez-Tubac*, 943 F.3d 1156 (8th Cir. 2019), is consistent with this case. In *Lopez-Tubac*, an ICE officer had a reasonable suspicion an individual was illegally in the United States where the officer knew, among other things, that the individual had been recently arrested while driving a car that was registered in another person's name, which, according to the ICE officer, was a "common tactic of individuals who illegally reenter the United States." *Id.* Here, there is no evidence Rosario-Azamar had been arrested while driving someone else's car, nor was there any testimony at the suppression hearing linking any of Rosario-Azamar's observed behaviors to illegal reentry.

Next, the majority errs in citing *United States v. Spencer*, 646 F. App'x 6 (2d Cir. 2016) (unpublished summary order). In *Spencer*, the Second Circuit noted that an ICE officer's reasonable suspicion of illegal reentry was supported by his review of the suspect's immigration file and immigration databases. *Id.* at 8–9. Of course, the transcript of the suppression hearing in that case included the following exchange between the government attorney and the investigating ICE officer:

> Q. Did you have an opportunity to review the paperwork contained in his immigration file?
> A. Yes.
> Q. And based upon your investigation, were you able to make any determination about his legal status?
> A. Yes.
> Q. And what was that?
> A. He has no status in the United States at this time.
> Q. Did you observe any removal or deportation paperwork in his alien file?
> A. Yes.

*United States v. Spencer*, 6:13-cr-06027, ECF No. 33, Tr. 41:2-12 (W.D.N.Y. 2014).

So, the officer in *Spencer* knew that the suspect had a previous deportation *and* no present legal status, and the government established each of these facts individually rather than inferring that a past deportation implies no present legal status. Accordingly, whether the officer in *Spencer* made an unreasonable assumption of present criminal activity based solely on deportation history was not before the Second Circuit. Moreover, the line of questioning in *Spencer* also suggests that, in the underlying investigation, the ICE officer even determined the suspect's legal status separately from confirming a prior deportation, which further supports that the Government in this case only carried half of its evidentiary burden. For comparison, here is the same line of questioning between the Government's attorney and Holmes:

> Q. Okay. Mr. Azamar is a Mexican national?
> A. Yes.
> Q. And did he have a prior immigration deportation history?
> A. Yes, he did.
> Q. So he had previously been deported?
> A. Yes, he was.
> Q. And you learned that information from Officer Olcott?
> A. Yes, I did.
> Q. Okay. And if Mr. Rosario-Azamar was in the United States, would that
> have any kind of legal implications?
> A. It would be a violation of 8 U.S.C. 1326, illegal reentry, which is a felony.

J.A. 70-71.

Finally, the majority cites *United States v. Salas-Avalos*, 459 F. App'x 318 (5th Cir. 2012), which has almost nothing in common with this case. The defendant in *Salas-Avalos* was an alien who challenged a vehicle stop, but that is where the similarity with this case ends. To begin, the ICE agents in *Salas-Avalos* had linked the defendant's residence "with a telephone number that was used in an alien smuggling scheme." *Id.* at 320. And, unlike

25

the gold Toyota Camry in this case, which Holmes and Olcott had observed Rosario-Azamar and others using to carpool to work at a restaurant, the automobile in *Salas-Avalos* had been pulled over and found carrying two undocumented aliens a day prior to the challenged stop. *Id.* And on the day of the stop, the ICE agents saw the truck, recognized the driver, and watched the truck stop at defendant's residence and later "discharge[] four to six passengers." *Id.* On those facts—none of which remotely resemble the facts in the record before us—it is unsurprising that the Fifth Circuit held that it was reasonable to stop the truck.

IV.

Rather than support the majority's position, our precedent instead shows the dangers of using a prior deportation to support "reasonable" suspicion. This Court has broadly held that, in most instances, "[a] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." *United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) (quoting *United States v. Foster*, 634 F.3d 243 246-47 (4th Cir. 2011)) (alteration in original). This is for good reason. "If the law were otherwise, any person with any sort of criminal record . . . could be subjected to [an] investigative stop by a law enforcement officer at any time without the need for any other justification at all." *Id.* (quoting *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006)) (alteration in original).

That is what happened here. When the officers stopped Rosario-Azamar, they had no concrete facts connecting him to any ongoing immigration violation. They simply knew that he had been deported in the past and, from that single fact, concluded that he had

26

returned to the country illegally. The Government relies on that thin reed to carry its case, but it is not enough.

Moreover, the problem here is even more acute than in the traditional case where officers make unfounded assumptions based on criminal histories because deportation is a civil proceeding. If we may not permit officers to conduct warrantless stops simply because an individual has a criminal record, *see Powell*, 666 F.3d at 188, then surely we may not permit officers to stop anyone with a civil deportation record. Indeed, if a deportation history alone justifies stopping an individual, then there is *nothing* that person can do to avoid being stopped. Rather, under the majority's reasoning, individuals may be subject to suspicionless stops for the rest of their lives simply because they were once subject to a civil deportation order. That troubling result is why the Fourth Amendment requires a particularized factual basis giving rise to a reasonable suspicion of ongoing criminal activity with respect to an individual. The facts of this case simply do not meet that standard, and therefore I must dissent.